## STATE OF CONNECTICUT *v.* MELVIN MCPHAIL
## (13427)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued October 4—decision released December 5, 1989

*Jo-Ann L. Bowen,* with whom was *Maurice T. Fitz-Maurice,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Robert Lacobelle* and *Richard F. Jacobson,* assistant state's attorneys, and *Kevin M. Kennedy,* law student intern, for the appellee (state).

SHEA, J. After a jury trial, the defendant was convicted of arson in the first degree in violation of General Statutes § 53a-111 (a) (1)[1] and two counts of arson murder in violation of General Statutes § 53a-54d.[2] In this appeal he claims that: (1) the state failed to disclose exculpatory information prior to a preliminary hearing conducted to determine probable cause; (2) the trial court erred by engaging in an ex parte communication with a juror; (3) the state failed to disclose the location of a witness he sought to present at trial; and (4) the trial court erred in giving a missing witness instruction against him. We find no reversible error.

---

[1] General Statutes § 53a-111 (a) (1) provides: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and . . . the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied."

[2] General Statutes § 53a-54d provides in part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person."

From the evidence presented the jury could reasonably have found the following facts. On the morning of April 28, 1986, a three-story, wood frame rooming house at 561–563 Newfield Avenue, in the city of Bridgeport, was set ablaze by means of combustible accelerants, resulting in the deaths of two of its residents. The defendant lived in the rooming house with his girlfriend, Hazel Carter, with whom, at the time of the fire, he had a stormy relationship. Before the fire started, other residents of the rooming house heard the defendant engage in a loud and prolonged argument with Carter. A Bridgeport police officer was dispatched to investigate this altercation and, as a result, the defendant was asked to leave the premises. Shortly after doing so, however, the defendant returned and continued the argument with Carter, albeit from outside their room, as Carter would not allow the defendant to reenter. The defendant was heard threatening to get Carter out "one way or another," and further, specifically threatening to burn down the rooming house. Shortly thereafter, the fire started and those residents who were able to do so evacuated the building. The defendant was seen, at that time, outside the building leaning against a fence. Later, at the Bridgeport Hospital, a witness noticed that the defendant looked very worried and smelled of gasoline.

I

The defendant first claims that the state's failure to divulge exculpatory evidence to him at the probable cause hearing required by General Statutes § 54-46a (a)[3] resulted in a constitutionally tainted find-

[3] General Statutes § 54-46a (a) provides in part: "No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed

ing of probable cause by the trial court. The defendant claims that the state was in possession of statements that, if divulged, would have enabled him to attack the credibility of one of the state's witnesses at the probable cause hearing and also to present evidence that the arson had been committed by someone other than himself.

During the probable cause hearing the state presented the testimony of Shirley Evans, a resident of the rooming house at the time of the fire. Evans testified that she lived in the room next to that of the defendant and Hazel Carter, and that the defendant and Carter had been engaged in "arguing, cursing and fighting" for most of the night prior to the fire. Evans also testified that the police had come to the rooming house, at "around three something," to quiet this argument and that the defendant had then left, but had returned sometime later in the morning. Evans also stated that when the defendant returned, Carter would not let him back into their room. At this point she heard the defendant tell Carter, "You going to get out of here one way or the other" because he was going to burn the house down. About ten or fifteen minutes after hearing this, Evans heard Carter bang on the wall and tell her that the building was on fire.

After Evans had completed her testimony, the defendant moved for disclosure of any written statements made by Evans in the possession of the state. This request was denied by the trial court on the ground

and that the accused person has committed it." This section was enacted in order to implement the adoption of amendment seventeen to the Connecticut constitution, which amended article first, § 8, to read in part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

that under General Statutes § 54-46a,[4] the defendant
at the probable cause hearing had no right to discovery of written statements made by the state's witnesses.

In response to a discovery request made prior to trial,
the defendant was, however, provided with copies of
statements made by Evans to members of the Bridgeport arson squad on May 1 and May 7, 1986. The
May 1, 1986 statement indicates that it was Carter, and
not the defendant, who had threatened to burn down
the house, and also appears to be somewhat inconsistent with Evans' testimony at the probable cause hearing concerning the timing of events during the night
prior to the fire.[5]

The defendant was also furnished, as a result of his
discovery request following the probable cause hearing, with statements made by Frank Singleton and
McKinley Tuck, both residents of the rooming house
at the time of the fire. Tuck's statement reveals that,
at a prior time, he had had trouble with a person he
had allowed to stay overnight in the rooming house,

---

[4] General Statutes § 54-46a (b) provides in part: "No motion to suppress
or for discovery shall be allowed in connection with such [probable cause]
hearing."

[5] Evans' May 1, 1986 statement includes in part:

"Q. When the argument started Melvin came in from the outside of the
building?

"A. I guess so, because he was banging on the door trying to get in.

"Q. What happened next?

"A. I heard the big door in the hallway slam close, and Melvin and Hazel
kept on arguing.

"Q. How long [did] this argument go on?

"A. Man, I don't know. I heard *Hazel* go down the hall and *say,* 'Man
I'm going to burn this bitch down!' Then when she was in her room, I heard
Melvin say, 'That you going to get out one way or other!'

"Q. Was Melvin still trying to get in the room?

"A. Yea.

"Q. Did Hazel let Melvin into the room?

"A. Sounded like Hazel was in the room, and Melvin was outside."
(Emphasis added.)

that the police had been called to get rid of this person, that the person had threatened to kill Tuck and burn the rooming house down, and that this person drove a grey Cadillac with a brown hood and fender. According to Singleton's statement, he saw this person and the grey Cadillac "down the street a little," after Singleton had escaped from the burning building. According to Singleton, this person was laughing at that time.

In *State* v. *Mitchell*, 200 Conn. 323, 338, 512 A.2d 140 (1986), we held, on the basis of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny, that "[s]ince the adversarial probable cause hearing [mandated by article first, § 8 of the Connecticut constitution as amended] . . . is an essential part of a defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time."[6] Subsequently, in *State* v. *Shannon*, 212 Conn. 387, 406, 563 A.2d 646 (1989), we held that in order for this court to consider claims of nondisclosure of exculpatory material at a probable cause hearing required by our state constitution, the defendant must demonstrate: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material." *State* v. *Milner*, 206 Conn. 512, 539, 539 A.2d 80 (1988). We further held, in *Shannon*, that the materiality of such exculpatory evidence is to be determined by utilizing the test set forth in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). *State* v. *Shannon*, supra, 406–407. Under the *Bagley* test,

---

[6] The *Brady* court based its holding upon the due process clause of the fourteenth amendment to the United States constitution. *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "A similar, independent right [to the disclosure of exculpatory evidence] exists under the due process provision of the Connecticut constitution." *State* v. *Cohane*, 193 Conn. 474, 495–96 n.16, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984).

nondisclosed exculpatory evidence will be considered material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682.

Applying these principles of law to this case, we find error in the state's failure to disclose to the defendant, at the probable cause hearing, the statements of Evans, Singleton and Tuck. It is well established that "[i]mpeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused." *State* v. *Pollitt,* 205 Conn. 132, 142, 531 A.2d 125 (1987); *United States* v. *Bagley,* supra, 676. The state concedes that the statements in question were both suppressed and favorable to the defendant. The state argues, however, that none of the statements were material to the determination of probable cause, as defined by the test announced in *Bagley.* We do not agree.

The state presented only two witnesses at the defendant's probable cause hearing: Evans and the investigating officer from the Bridgeport fire department's arson squad. The defendant does not claim that the evidence presented at the probable cause hearing was insufficient to warrant a person of reasonable caution to believe that the accused had committed the crimes of arson and arson murder. *State* v. *Shannon,* supra, 404; *State* v. *Mitchell,* supra, 336. The defendant does claim, however, that, since the testimony of the arson inspector established only the commission of the alleged offenses, the materiality of the nondisclosed statements must be determined solely on the basis of the testimony given by Evans. This is the proper inquiry to be made, as it was only the testimony of Evans that linked the defendant to the commission of the crimes established

by the arson investigator. Given this focus, the trial court had before it only Evans' testimony that the defendant had been engaged in a fight with Carter, had been asked to leave the building by a police officer, had returned shortly thereafter, had threatened to burn down the rooming house and that the fire had started shortly after this threat had been made. Evans did not *see* the defendant engaged in *any* activities during the time before the fire, nor did the state introduce, at the probable cause hearing, any other evidence linking the defendant to the commission of the charged offenses. While we agree with the state that the evidence presented supported a finding of probable cause by the trial court, the credibility of Evans' testimony was critical to that determination.

Under these circumstances, we conclude that there exists a reasonable probability that, had the statements of Evans, Singleton and Tuck been provided to the defendant, the result of the probable cause hearing would have been different. In reaching this conclusion, we are "aware of what adverse effect the nondisclosure may have had on the defendant's preparation or presentation of his case and that we should act 'with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the [probable cause hearing] . . . would have [otherwise] taken . . . .' " *State* v. *Pollitt,* supra, 148–49, quoting *United States* v. *Bagley,* supra, 683. In light of the meagerness of the state's presentation, impeachment of Evans' version of the sequence of events leading up to the fire, coupled with the information concerning the presence and motive of the person mentioned by Singleton and Tuck, might well have led the trial court to conclude that there was no probable cause to hold the defendant to answer for the crimes with which he had been charged.[7]

---

[7] The defendant would have been allowed to cross-examine Evans concerning the inconsistent statements, and would have been allowed, follow-

Having concluded that the state was constitutionally obligated to disclose the statements of Evans, Singleton and Tuck, we must now determine whether the defendant is entitled to relief. It is clear that, if the failure to disclose these statements had occurred *at trial* and the state had presented only the testimony of Evans and the arson investigator, such a breach of the state's duty to disclose exculpatory evidence would entitle the defendant to a reversal of his conviction and a new trial. *State* v. *Cohane,* 193 Conn. 474, 499, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984). The defendant would also be entitled to a new trial had we not concluded in *State* v. *John,* 210 Conn. 652, 665 n.8, 557 A.2d 93, cert. denied, U.S. , 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), that deficiencies in the conduct of probable cause hearings pertain, "not to subject matter jurisdiction, but only to jurisdiction over the person of the defendant."

We must next determine, therefore, whether a finding of probable cause, tainted not by insufficiency of the evidence supporting that finding but by the state's failure to disclose exculpatory evidence, deprives the trial court of jurisdiction over the person of the defendant. This situation is not unlike the question we resolved in *State* v. *Fleming,* 198 Conn. 255, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). In *Fleming,* we held that "[w]here the fairness of a subsequent prosecution has not been impaired by an illegal arrest, neither the federal nor the Connecticut constitution requires dismissal of the charges or a voiding of the resulting conviction." Id., 263. We based that holding on the premise that "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges

ing a determination of probable cause, to make at least an offer of proof concerning the third party information contained in the statements of Singleton and Tuck. General Statutes § 54-46a (b).

against him and after a fair trial in accordance with constitutional procedural safeguards." *Frisbie* v. *Collins*, 342 U.S. 519, 522, 72 S. Ct. 509, 96 L. Ed. 541 (1952).

In *State* v. *Mitchell*, supra, 331–32, however, we specifically declined to adopt the state's request "to extend the principle underlying *Fleming* and to hold that all defects in pretrial procedures are cured by a subsequent conviction after trial . . . ." We concluded, therefore, that "an invalid finding of probable cause at such a hearing undermines the court's power to hear the case at trial." Id., 332. We did not, in *Mitchell*, define precisely what defects would render a finding of probable cause "invalid," although implicit in our decision was an understanding that, at the very least, insufficiency of the evidence presented at the probable cause hearing will deprive the trial court of jurisdiction over the person of the defendant, thus rendering moot any subsequent prosecution and conviction. While we decline, at this time, to limit *Mitchell* to that understanding, we conclude that where, as here, there has been a failure to disclose exculpatory evidence at a criminal defendant's probable cause hearing, the proper inquiry is not whether there exists a reasonable probability that the undisclosed evidence would have changed the outcome of that hearing, but rather, whether the nondisclosure did in fact taint the defendant's subsequent prosecution. On this basis, we adopt the jurisdictional reasoning of *Fleming*, and look to the record to determine whether the state's nondisclosure deprived the defendant of his constitutional right to a fair trial. We conclude that in this case there was no such deprivation.

The exculpatory statements in question were disclosed to the defendant prior to trial and were available to him for both the preparation and presentation of his defense. Our review of the trial transcript reveals that the defendant expressly elected to pose no ques-

tions to Evans after the state had completed its direct examination of her.[8] Further, the defendant called Tuck as a witness and questioned him in detail concerning the circumstances of the threats made by the person with the grey Cadillac, to whom Tuck's statement referred. In fact, the relevant portion of Tuck's statement was made an exhibit after Tuck could not recall having told investigators that this person had threatened to burn down the rooming house. The defendant also, during cross-examination, presented to the jury Singleton's version of seeing this person on the morning of the fire, as well as Singleton's knowledge of the trouble between Tuck and this person. Finally, the defendant relied upon this evidence in his final argument, claiming that several persons, including the man with the grey Cadillac, had both the motive and the opportunity to set the rooming house on fire. As is evident by its verdict, the jury rejected this theory of defense.

We conclude that the failure of the state to disclose exculpatory evidence at the probable cause hearing did not deprive the defendant of his constitutional right to a fair trial and thus was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 22–23, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967).

---

[8] The defendant's actions are not surprising in light of Evans' testimony on direct examination, as well as the contents of her May 7, 1986 statement, which includes the following:

"Q. Did you hear any threats just prior to the fire at 561 Newfield Ave?

"A. I heard Melvin say when he was in the hall I am going to burn this mother fucker down[.] Hazel you are going to get out one way or another.

"Q. Why did you not tell us this on the previous statement?

"A. Because I was worried about my son and this man[']s house [too].

"Q. How soon after hearing this did the fire [occur]?

"A. I don't know[,] it got quiet[,] about 5 or 10 [minutes]."

## II

The defendant's second claim of error, denial of a fair trial due to ex parte communications between the trial judge and a member of the jury, we find unpersuasive. The trial transcript reveals that on the morning of the jury's third day of deliberations, the trial judge was notified that a juror who was pregnant had fallen at home and was unable to be present that day. The judge informed counsel that he had telephoned the juror's number, had told the person answering the phone that no conversation was permissible, but that, if possible, the juror was to come to court and, if not able to do so, she was to be available for a phone conference with the court clerk and counsel. The judge further informed counsel that when the juror had not arrived by 10 a.m., the court clerk had called the juror and had been informed that she was fearful of any movement and would not be able to be present that day. The trial court asked whether either the defendant's counsel or the state's attorney had any objection to the action taken and was informed by both that there was none. The other jurors were informed of the condition of their colleague and were released for the day. The court then asked counsel if "there [was] any objection to anything [it had] done today?" The defendant's counsel replied: "None, Your Honor."

The next morning, a Friday, the court informed counsel that the clerk had, at its direction, again telephoned the juror who had been unable to attend the day before. The clerk stated that the juror had indicated she was to see her doctor that morning and would call the court after that had been accomplished. After receiving suggestions from counsel on how best to proceed, the trial court released the remaining jurors until the results of the doctor's examination could be obtained. Later that morning, the clerk informed the trial court and

counsel that he had been unable to contact the juror by telephone. The court suggested that the remaining jurors be released for the day, with the proviso that they telephone the clerk later in the afternoon. At this point the defendant moved for a mistrial based on the potential delay in the jury's deliberations. His motion was denied and the jurors were released with instructions to call the office of the court clerk later that afternoon to find out when next to report for further deliberations. The injured juror returned for deliberations the following Monday, the day on which a verdict was reached.

"It has long been the law of this state that jurors shall not converse with any person, not a member of the jury, regarding the cause under consideration . . . ." *Aillon* v. *State,* 168 Conn. 541, 545, 363 A.2d 49 (1975). "It has thus become a universally accepted principle that communications between a judge and a jury, especially after the jury have begun deliberations, should be made only in open court in the presence of the parties." Id., 546; *State* v. *Altrui,* 188 Conn. 161, 181–82, 448 A.2d 837 (1982); *State* v. *McCall,* 187 Conn. 73, 81–82, 444 A.2d 896 (1982); *State* v. *Hackett,* 182 Conn. 511, 522–23, 438 A.2d 726 (1980). "In a criminal trial this rule takes on constitutional dimensions since the accused has a right to be present at every stage of the trial and to have the assistance of counsel for his defense." *Aillon* v. *State,* supra, 546. We have held, consequently, that where a trial judge engages in an ex parte communication with a juror concerning the cause under consideration by that juror, prejudice will be presumed and the burden will shift to the state to show that the communication was harmless beyond a reasonable doubt. *State* v. *Altrui,* supra, 182. This presumption will apply "however innocuous the communication may be reported to be . . . ." Id. We have also held that claims of ex parte communications are

reviewable by this court despite the failure of the defendant to raise any objection in the proceedings below. *State* v. *Hackett,* supra; *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

In addressing the merits of the defendant's claim, the state argues that the record is not clear whether the trial judge in fact engaged in an ex parte communication with the injured juror. The state claims that the communication was indirect, rather than direct, by virtue of the trial judge's comment that "I told *him* that I could not speak with the juror or have any discussion with the juror . . . ." (Emphasis added.) The state's reliance on this distinction is misplaced. Regardless of whether the contact with the juror was direct or indirect, the disclosure made by the trial judge clearly indicates that his message was intended to be given to the juror. The question of whether the trial judge's message was passed through an intermediary thus becomes irrelevant, where the message itself was expressly intended to be a communication from the judge and not the intermediary.

In determining the propriety of the trial judge's actions, we note that his evident concern was only for the progress and not the substance of the jury's deliberations. There is no claim by the defendant that the communications in question were in any way related to the cause under consideration by the injured juror. We conclude, nonetheless, that a more prudent course of action would have been for the trial judge to notify counsel prior to any action taken to contact the juror in question.[9] In this manner, the defendant and his counsel

---

[9] The defendant also claims error in the trial court's actions in directing the court clerk to make further telephone communications with the juror concerning her ability to continue deliberations. While it is certainly true that prejudicial or coercive comments made by court officials other than the trial judge can constitute reversible error; see 75 Am. Jur. 2d, Trial §§ 1002 through 1004 and cases cited therein; it is also recognized that "the

would have been able to be present during the course of the trial judge's communication, and would also have been able to lodge any objections to, or suggest alternatives for, the trial judge's proposed course of action. Had this been done and had the defendant expressly consented to the action contemplated, he could not now be heard to claim any error on the part of the trial judge. *United States* v. *Musto,* 540 F. Sup. 318, 336 (D.N.J. 1982).

Despite our discussion of possible alternatives to the trial judge's ultimate resolution of the problem with which he was confronted during the jury's deliberations, we conclude, nonetheless, that any error was harmless beyond a reasonable doubt. The trial court made a full and immediate disclosure of what had transpired during the telephone call to the juror's home. At no time did the defendant object to any of the actions taken by the trial court or the clerk. Further, counsel

custodian of a jury necessarily must have some communication with them in order to attend to their needs, carry messages to the court, and the like . . . . " Id., § 1008, p. 845. Further, it is also recognized that where a defendant is apprised of contemplated communications with members of the jury, specifically assents to the procedures to be utilized and is provided full disclosure of the contents of the communications, he may not later complain of error in that which he had previously approved. *United States* v. *Musto,* 540 F. Sup. 318, 336 (D.N.J. 1982). The record here reveals that after his own telephone call to the injured juror and prior to any action being taken by the clerk, the trial judge met with counsel and revealed to them what had already transpired. The record also shows that the clerk then made telephone contact with the juror, whereupon the trial judge disclosed, for purposes of the record, all that had transpired. Upon being asked if there was any objection to what had occurred to that point, counsel for the defendant replied: "We have none, Your Honor. I have discussed this with Mr. McPhail." Thereafter, all actions taken by the court clerk were disclosed upon the record. At no time did the defendant voice any concern or objection to the course of action taken or the communications made. Taking into consideration these circumstances, as well as the fact that the defendant does not claim on appeal that the conversations of the court clerk consisted of any coercive or prejudicial comments regarding the subject matter of the trial, we conclude that the claim of error regarding communications between the court clerk and the injured juror is without merit.

for the defendant made the affirmative statement that there were *no* objections to the trial court's actions on the first day that the juror was not available for deliberations. The defendant did not seek to clarify the actions of the trial court or the clerk and did not seek to question the juror, upon her return, concerning any effect the telephone conversations might have had on her ability to continue deliberations in an impartial manner. We conclude, therefore, that the state has satisfied its burden and that the defendant has suffered no prejudice as a result of the trial judge's actions.

## III

In his third claim of error, the defendant asserts that he was denied his constitutional right to compulsory process and a fair trial by the state's failure to inform him of the address of a potential witness. We find no merit in this claim.

On October 29, 1987, the defendant filed a request that the jurors be charged that they might draw an adverse inference against the state by virtue of its failure to call Hazel Carter as a witness. That same day, the jury heard testimony from three witnesses who had been hired by the defendant to attempt to locate and serve subpoenas on both Carter and a potential alibi witness. All three witnesses testified that their efforts had, until that time, been unsuccessful. After further testimony concerning the possible whereabouts of the alibi witness, counsel for the defendant informed the trial court that he thought he had presented sufficient evidence to avoid a missing witness instruction relating to the defendant's failure to present the potential alibi witness. See *Secondino* v. *New Haven Gas Co.*, 147 Conn 672, 165 A.2d 598 (1960).

On November 2, 1987, the next day of trial, counsel for the defendant asked that the trial court allow him to present further testimony concerning efforts made,

after October 29, to locate the alibi witness. The court granted permission, at which point the state's attorney informed the court that he "did have Hazel Carter. She had been subpoenaed. She was told to come in here this morning at ten o'clock. She has failed to show up at this point." The state's attorney also informed the court that he would be seeking a capias to ensure Carter's presence to testify. Counsel for the defendant made no inquiry into the whereabouts of Carter, electing instead to present further testimony concerning the efforts that had been made to locate the potential alibi witness.

That same day, the defendant having rested, the state presented testimony from James Gallick, an investigator in its office. Gallick testified, outside the presence of the jury, that he had served a subpoena on Carter on October 26, 1987, in the courthouse, and that he had not seen her on the day of his testimony. Gallick also stated that Carter had provided the state with her current address, 36 6th Street, and that this had been placed upon the subpoena. Gallick testified further that he had made an unsuccessful attempt to locate Carter on 6th Street, but that he had been unsure of the correct house number at the time he had gone. The state's attorney informed the trial court that Carter had been told to appear that day, had failed to do so, and that the state "would like to have a chance to get a capias for Miss Carter. It would appear that she would have some valuable testimony to add to this case by way of rebuttal in this particular case."

The defendant strenuously objected to the issuance of a capias on several grounds: that the subpoena was invalid on its face; that the state was merely attempting to escape a missing witness instruction for its failure to call her during its case-in-chief; that Carter was available and could have been called as a witness during the state's case-in-chief; that her testimony would

not be admissible in rebuttal; and that to issue a capias would merely prolong the trial, which was already in its fourth week. Apparently persuaded by the defendant's argument, the trial court denied the state's request that a capias be issued to bring Carter into court.

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). Where, as here, a defendant claims that action on the part of the government has resulted in his inability to present witnesses in his defense, there is no violation of the compulsory process clause of the sixth amendment unless the defendant can make "some plausible explanation of the assistance he would have received from the testimony of the [missing] witness." *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 871, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Likewise, there is no violation of the constitutional right to due process of law unless the defendant makes "some explanation of how [the witness'] testimony would have been favorable and material." Id., 872.

As a threshold consideration, we conclude that the question of whether Carter's testimony would have been favorable and material to the defendant is irrelevant, as the record makes patently clear that the defendant had no desire to call Carter as a witness for his defense. Regardless of the defendant's initial objec-

tive in attempting to subpoena her, it later became obvious that, as a matter of trial strategy, the defendant was willing to exchange whatever benefit Carter's testimony would have afforded him for the potential benefit of a missing witness instruction against the state. This strategy manifested itself both in the defendant's strenuous and repeated objection to the issuance of a capias, as well as in his complete silence once the state's investigator revealed the fact that he had served Carter with a subpoena and that she had provided her address to the state. The defendant made no claim of concealment before the trial court and did not request a continuance so that he might investigate this new information. We conclude that just as the "Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use"; *Washington* v. *Texas,* supra, 23; the framers also did not intend to give to a defendant the right to secure the attendance of witnesses whose testimony he had no desire to use. There is no merit to this claim.

## IV

The defendant requested that the jurors be instructed that they might draw an adverse inference against the state for its failure to call Hazel Carter as a witness. This request was granted by the trial court. Despite his failure to object to the charge as given, the defendant now claims that the trial court committed plain error in its rendering of this missing witness instruction. We conclude that there was no error.

With the exception of one reference to Hazel Carter, the defendant's request to charge[10] consists of noth-

[10] The defendant requested that the jury be charged as follows: "You will recall that during the final arguments here, reference was made to the absence of Hazel Carter. As indicated in the course of the argument of the

ing more than a generic statement of the principles, set forth in *Secondino* v. *New Haven Gas Co.*, supra, concerning inferences to be drawn by a party's failure to call an available and natural witness. There is no intimation, in the request, that the adverse inference was to have been drawn against the state, as the defendant elected to use the term "party" in his statement of the applicable law and did not supply the trial court with any statement as to how that law was to be applied to the facts of this case. See Practice Book § 854. On several occasions during its charge and recharge to the jury, the trial court utilized the phrase "the state or the accused" as amplification of the defendant's generic use of the term "party." At no time did the defendant object to this amplification nor did he object to any other aspect of the instruction given by the trial court. The defendant now claims that the trial court, by its use of the phrase "the state or the accused," allowed the jury to draw an adverse inference against him for his failure to call Carter as a witness.

Our review of the defendant's requested jury instruction on the issue of the failure of the state to call Carter as a witness and the transcript of the jury instruction

case, attention was called to the failure to call a certain witness who might by his testimony have shed some light on the situation before you. Where a party fails to call a witness, you may infer that the witness' testimony would have been unfavorable to the party's cause, if you find firstly that the witness was available, and that the witness was one that the party would naturally produce. Whether the witness was available is a question of fact for you to determine as a condition precedent to drawing any adverse inference from the absence of the witness. Availability may be shown or determined not only from the mere physical presence or accessibility for service, but also from the relationship, usefulness, or nature of the expected testimony, and this means only that the witness is in such a relationship with the party that it is likely that his presence could be procured. A witness who would naturally be produced by a party is one who is known to that party or who by reason of his relationship to that party or to the issues or both could be reasonably expected to have peculiar or special information material to the case, which, if favorable, the party would produce."

given leads us to conclude that the trial court substantially complied with the defendant's request. *State* v. *Edwards,* 201 Conn. 125, 157, 513 A.2d 669 (1986). "In this regard, we note that 'a refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance.' *Mazzucco* v. *Krall Coal & Oil Co.,* 172 Conn. 355, 357, 374 A.2d 1047 (1977); see *State* v. *Shindell,* [195 Conn. 128, 143, 486 A.2d 637 (1985)]; *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980). The charge is to be considered as a whole and 'individual instructions are not to be judged in "artificial isolation" from the overall charge. *State* v. *Reed,* 174 Conn. 287, 305, 386 A.2d 243 (1978); *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977).' *State* v. *Estep,* 186 Conn. 648, 652, 443 A.2d 483 (1982)." *State* v. *Edwards,* supra, 157.

Regardless of any linguistic distinctions that may exist between the term "party" and the phrase "the state or the accused," we conclude that the substance of the defendant's request was accurately given to the jury.

There is no error.

In this opinion CALLAHAN, GLASS and COVELLO, Js., concurred.

PETERS, C. J., concurring. I fully subscribe to parts II, III and IV of the majority opinion. I also agree with the two conclusions reached in part I of the opinion, that the state improperly failed to disclose exculpatory material at the defendant's probable cause hearing, and that this error was harmless in the circumstances of this case. I respectfully disagree, however, with the majority opinion's reliance on *State* v. *Fleming,* 198 Conn. 255, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986), as the basis for concluding that the error was harmless. In my view,

*State* v. *Mitchell,* 200 Conn. 323, 338, 512 A.2d 140 (1986), compels a different analysis.

*State* v. *Mitchell* was this court's first opportunity to establish ground rules to govern probable cause hearings prescribed by amendment seventeen to article first, § 8 of the Connecticut constitution for defendants charged with crimes "punishable by death or life imprisonment." In *Mitchell,* the state vigorously argued that a finding of probable cause at a preliminary hearing should be completely unreviewable following conviction after trial. The state sought to broaden the scope of our holding in *State* v. *Fleming,* supra, 263, that an illegal arrest, without more, "imposes no jurisdictional barrier to a defendant's subsequent prosecution" and therefore does not require "a voiding of the resulting conviction." We rejected the state's argument because of the fundamental distinction between an arrest and a constitutionally mandated adversarial probable cause hearing. An arrest, according to our law, is neither an integral part nor a critical stage of a judicial proceeding. A probable cause hearing specifically mandated by our state constitution, by contrast, is a critical stage in a criminal prosecution. Accordingly, we concluded that an invalid finding of probable cause undermines the trial court's jurisdiction to hear the case at trial. *State* v. *Mitchell,* supra, 332.

While establishing the ultimate reviewability of a finding of probable cause at a preliminary hearing, *Mitchell* noted that the burden of proof appropriate to sustain such a finding was "less than the quantum necessary to establish proof beyond a reasonable doubt at trial . . . ." Id., 336. The proper standard, we held, was a determination " 'whether the government's evidence would warrant a person of reasonable caution to believe that the accused [had] committed the crime.' " Id.

In my view, *Mitchell* establishes two basic principles for constitutionally mandated probable cause hearings. First, these pretrial proceedings, since they are a critical stage in a defendant's criminal prosecution, call for more intensive appellate scrutiny than that which obtains in the event of arguably illegal arrests, searches or seizures. Second, the standard for appellate review is a "reasonable belief" standard that focuses more on the content than on the credibility of the witnesses presented by the state at the probable cause hearing.

Applying these principles in the present case, I believe it is inappropriate to invoke the invalid-arrest analysis of *State* v. *Fleming* to determine the harmlessness of the state's wrongful failure to disclose exculpatory evidence at the defendant's probable cause hearing. *Mitchell* requires us to focus on what happened at the probable cause hearing and not on what happened at the subsequent trial. The majority opinion's reliance, in this case, on the jurisdictional reasoning of *Fleming* cannot be reconciled with our holding in *Mitchell*. Events at the defendant's plenary trial cannot directly demonstrate the harmlessness of the state's misconduct.

The conclusion of harmlessness can, nonetheless, be sustained in this case because the record demonstrates, beyond a reasonable doubt, that timely disclosure of the exculpatory evidence would not have altered the outcome of the probable cause hearing. It would be entirely speculative to suppose that the defendant would have made more vigorous use of this exculpatory evidence at the probable cause hearing than he did at trial. The majority opinion describes the minimal use of this evidence at trial, particularly the failure to use the evidence to impeach Evans by cross-examination. Although in toto the evidence might have raised some doubt about Evans' credibility, the court deciding the issue of probable cause would still

have been free to conclude that " 'a person of reasonable caution [would] believe that the accused [had] committed the crime.' " *State* v. *Mitchell,* supra, 336. In sum, although the exculpatory evidence in this case was sufficiently material so that there was, initially, a reasonable possibility that its disclosure would have changed the outcome of the probable cause hearing, subsequent events establish the unlikelihood that this possibility would in fact have come to pass. See *United States* v. *Snyder,* 872 F.2d 1351, 1356 (7th Cir. 1989); *United States* v. *Bartlett,* 856 F.2d 1071, 1085–87 (8th Cir. 1988); *United States* v. *Morales-Macias,* 855 F.2d 693, 694 (10th Cir. 1988); *Clark* v. *Wood,* 823 F.2d 1241, 1248–49, cert. denied, 484 U.S. 945, 108 S. Ct. 334, 98 L. Ed. 2d 361 (8th Cir. 1987). On this record, I am persuaded that the state has proven the harmlessness of its misconduct.

Accordingly, I respectfully concur in the judgment.