No. 71,189 [1]

STATE OF KANSAS, *Appellee*, v. JOEL D. BUTLER, *Appellant*.

(897 P.2d 1007)

---

[1] **REPORTER'S NOTE:** For modified opinion, see 257 Kan. 1110.

Opinion filed June 13, 1995.

*Scott M. Price*, of Marietta, Kellogg & Price, of Salina, argued the cause, and *Elizabeth L. Marietta*, of the same firm, was with him on the brief for appellant.

*Julie McKenna*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a direct criminal appeal from aggravated robbery and felony-murder convictions. The defendant, Joel D. Butler, raises numerous issues which he claims require us to reverse both convictions. However, our review discloses no reversible error, and for the reasons set forth below we affirm the convictions and sentence of the defendant.

Early in the morning on August 10, 1992, the Mid-America Inn in Salina was robbed, and the night clerk, Oliver Bigler, was murdered. Police were called to the scene when Audrey Wright, who arrived at the motel at approximately 4:50 a.m. to open the restaurant, found the door locked and was unable to summon the night clerk.

Officer Glen Soldan of the Salina Police Department testified that he arrived at the motel at 5:30 a.m. and went to check the back door. Approximately 25 feet from the back door, Soldan found a safe lying in the grass near a white plastic ice bucket and a canvas

bag. Soldan testified that he attempted to enter the motel through the back door but the deadbolt lock was engaged.

Eventually, the manager of the motel arrived with a key to the motel office. Inside, police found the office area splattered with blood, and they discovered Bigler's body lying in front of the desk. Bigler had sustained severe trauma and lacerations to the head, and police discovered a letter opener embedded in Bigler's neck.

David Klamm, a special agent with the Kansas Bureau of Investigation, searched the office area. He found a broken blood-stained BB gun along with some pieces of wood that looked as if they had come from the stock of the gun. Kelly Robbins, a KBI forensics examiner, testified that she found a blood-stained brick. Officers also found what appeared to be a broken piece of a collapsible antenna. A police dog searched the wooded area east of the motel and discovered a handgun.

An autopsy revealed that Bigler had suffered severe trauma to the head as well as severe stab wounds and lacerations, including a stab wound in the right ear canal. In the opinion of Dr. Norman Macy, death was caused by several severe blows which destroyed the front of the head and tore the brain in half. The head injuries were consistent with those that could have been caused by a brick or gun stock.

Butler was arrested and charged with premeditated murder, felony murder, and aggravated robbery. Three other individuals, Juan Anthony, Artis Swafford, and Jennifer Harmon were also charged as a result of the murder and robbery. Butler, Anthony, and Swafford were tried jointly.

On December 3, 1992, Butler came before the court for his preliminary hearing. Ron Hagan, an agent for the Kansas Bureau of investigation, testified that he had searched the car of Juan Anthony and found blood in the back seat. James Norton, an officer for the Salina Police Department, testified that he discovered a partially smoked Marlboro cigarette on the ground in the corner of the parking lot.

Butler objected to the testimony of Karen Renee Greer concerning statements made by Juan Anthony, contending that the testimony was hearsay. The State argued that the statements

should come in under the coconspirator exception found in K.S.A. 60-460(i)(2). After much discussion, the court overruled the objection, finding that there was sufficient evidence on the record to establish a conspiracy. Greer testified that Anthony had told her he, Butler, and Swafford were going to rob a motel, knock out the clerk, and stick a sharp object in the clerk's throat.

Detective Edward Swanson of the Salina Police Department testified that the motel's safe was found in the grass behind the motel. He stated that one person acting alone would be unable to move the safe. Lieutenant Brian Shea of the Saline County Sheriff's Office testified that after Butler's arrest defendant Butler purchased several brands of cigarettes from the jail: Kools, Marlboro Reds, Marlboro 100's, and a generic brand. The State then recalled Sergeant Sweeney, who testified that during the search of Anthony's car, a black folder belonging to Butler was found in the rear compartment. Over the defendant's motion to dismiss, Butler was bound over to stand trial of all charges based primarily on the testimony of Greer.

Butler and the other defendants filed a motion for change of venue, contending that pretrial publicity created a substantial likelihood that they would not receive a fair trial. In support of the motion, Randall Picking of KSAL radio in Salina testified that his station had broadcast a call-in show that dealt with the crime on the day of the defendants' arrests. Raymond Pollard, the vice-president of KSKG radio in Salina, stated that his station had reported stories on the murder, including the names of the persons arrested. George Pyle, the editor of the Salina Journal, stated that he had published articles which had detailed the prior convictions of Anthony as well as stories which stated that Anthony's neighbors were afraid of him because he and his friends carried guns and had all-night parties. Pyle also admitted running a story on the trial testimony with a headline stating that Anthony had planned the robbery and murder. Other radio news directors testified that they had run stories on the murder and the suspects.

The defendants then presented the testimony of Dr. James Franke, the director of the Survey Research Unit at the Kansas State University Institute for Social and Behavioral Research. Dr.

Franke testified that he had conducted a public opinion poll to test the public's knowledge of the case. The survey showed that of 366 persons surveyed, 97.5% had heard about the case. Of those people, 49% thought that the evidence was strong against all the suspects and 56% of those surveyed felt that the evidence was strong against Butler.

The district court determined that the defendants had failed to show prejudice to such a degree that it would be impossible to obtain an impartial jury. Accordingly, the court denied the motion.

The court then took up the motion for severance of defendants. The district court stated that many of the alleged hearsay statements would come in under the coconspirator exception to the hearsay rule. The court ordered that any other hearsay statements of Anthony regarding Swafford and Butler should be redacted. Accordingly, the court denied the motion to sever.

At trial, the State called Marilyn Jensen, who testified that she was traveling through Salina in the early morning hours of August 10 and that she stopped at the Mid-America Inn around 1:00 or 2:00 a.m. According to Jensen, an older gentleman, presumably Bigler, told her there were no vacancies and directed her to the Ramada Inn. Marie McDaniel, the desk clerk at the Best Western Heart of America Inn, another motel in Salina, stated that she last spoke to Bigler at 2:00 a.m.

Randy Jennings, a patrolman with the Salina Police Department, testified that he had stopped Anthony at approximately 2:38 a.m. for running a red light. According to Jennings, after he gave Anthony a warning, Anthony drove off heading north. Earlier that evening, Jennings had stopped a car driven by Orvin Mixon and arrested Mixon for driving while suspended. Swafford was a passenger in the car and was allowed to drive it away.

Don Dean, the general manager of the Mid-America Inn, testified that there were only two keys to the back door, one of which was kept at the office. He identified the safe found outside the door as the one that was kept in the office and the place where all the business proceeds and receipts were kept. He identified the white bag found outside as the bank bag where the small bills were kept.

Robert Taylor, a desk clerk at the Mid-America Inn, stated that in order to open the cash register, the button marked "room number" must be depressed. There had been two previous robberies of the motel that summer, and everyone who worked there thought it was an "inside job" because during the second robbery the robber knew how to open the cash register.

The State next presented the testimony of Lieutenant Kiltz of the Salina Police Department. Kiltz testified that he had executed a search warrant on the home of Juan Anthony and his mother. Inside Anthony's bedroom, Kiltz found a .38 revolver.

Officer Briggs testified that he also was involved in the search of Anthony's residence. Briggs testified that he searched a trash can and found a battery-operated walkie-talkie inside an empty dog food bag. The antenna of the walkie-talkie had been broken off. The walkie-talkie's casing was broken, and there were hair and carpet fibers on it.

L.J. Stephenson, a KBI firearms and toll examiner, testified that the antenna piece found at the crime scene matched the piece of the antenna found on the walkie-talkie in Anthony's trash can. Stephenson also testified that the wood chips found on the floor of the crime scene came from the stock of the BB gun found at the scene.

Sergeant Sweeney of the Salina Police Department testified that he also helped search Anthony's residence and car. In Anthony's bedroom, he found a walkie-talkie. In Anthony's car, he discovered a $10 roll of quarters and a Tec 9 handgun.

The State next introduced the testimony of Kit Phifer. Phifer testified that she knew the defendants and that on August 9 she was with friends Renee Greer, Sunshine Daniels, and Stephanie Neustrom. According to Phifer, the other girls took her home early that evening. The next morning she called Greer. Phifer asked Greer if she had known about the robbery, and Greer indicated that she had. Later, Greer told Phifer that Anthony had showed her a key to the motel office.

Sunshine Daniels was the next person to testify. Daniels indicated that she had known the defendants for about a year but that the night of August 9 was the first time that Greer had met An-

thony. According to Daniels, after the group had dropped Phifer off, they went to Anthony's house. Later, Greer and Anthony left to take Stephanie Neustrom home. They then took Daniels to her boyfriend's house.

Daniels testified that the next day Greer told her that she and Anthony had gone out to eat barbecue at Orvin Mixon's house. However, later, Greer told Daniels about the murder.

At this point, the attorneys for Swafford and Butler objected on the ground that anything Greer told any of the girls as to what Anthony told her was hearsay and inadmissible. Earlier, they had made the same objection when Phifer was testifying, although no hearsay information had actually been elicited. The district court had overruled the previous objection on the ground that any statements would be subject to the conspiracy exception. It again made the same ruling.

According to Daniels, Greer told her that Anthony had planned the murder and told her about it. Greer also told Daniels that she had sex with Anthony that night.

Krista Young then testified that in August 1992, she lived with Orvin Mixon. On August 9-10, they had a barbecue. According to Young, Swafford and Butler had been at the barbecue most of the evening. She testified that she went to bed around 3:00 or 4:00 a.m. and did not see Anthony at the barbecue. Immediately afterward, however, she testified that she had seen Anthony at the barbecue but she had not seen Anthony, Swafford, and Butler leave together.

The State next called Stephanie Neustrom to the stand. Neustrom stated that she had a sexual relationship with Butler. Neustrom reported that on the night of the crime, Anthony and Greer took her home around 10:00 or 11:00 p.m. The next day she had a phone conversation with Greer and Greer told her that she had sex with Anthony. A few days later, Greer told her that Anthony had left the house in the middle of the night to rob the Mid-America Inn.

Once again, the defendants' attorneys made hearsay objections, which were overruled. Neustrom went on to relate that Greer told her Anthony had planned to rob the motel and injure the clerk.

Greer also told Neustrom that she helped him count money when he returned. Neustrom asked Greer if Butler was involved, and Greer told her that Butler did not know what was going to happen when he got into the car with Anthony. Neustrom testified that Greer told her Butler drove the car and waited outside.

At this point, Butler's attorney lodged a hearsay objection, which was overruled. Neustrom then testified that Greer told her Swafford and Anthony were supposed to hit the clerk but that when the clerk did not go down, Swafford went back outside.

Greer then testified. She stated that after taking Daniels and Neustrom home, she and Anthony went back to his house and had sex. Sometime after 2:30 a.m., Anthony told her that he, Butler, and Swafford were going to rob a motel and kill the night clerk by shoving a sharp object down his throat. Anthony showed her the key they were going to use to get into the motel. Before Anthony left, she saw walkie-talkies, and Anthony showed her a sharp object which looked like a nail file. However, she testified that the object was not the letter opener found in Bigler's body.

According to Greer, Anthony returned later and told her that he had been over at Mixon's house. However, he was carrying some money, and Greer helped him count it. Greer also testified that at one time she considered herself engaged to Anthony and that she had previously lied to police and given alibi testimony for him.

The State then called Ramona Keil, a night clerk at the Mid-America Inn. Keil testified that she had been on duty during the two previous robberies at the motel. She testified that on May 31, 1992, a man entered that motel and asked for a room. When she turned to look at the clock, he hit her on the head and then continued hitting her until she passed out. Eventually, she was thrown into the restroom, and she heard someone hitting the cash register keys. The person was unable to open the register, and nothing was taken.

Keil testified that on July 7 the front and back doors of the motel were locked. She was watching TV in a room next to the office when she heard glass break. When she went out into the lobby she saw the man from the first robbery, who proceeded to hit her with a black club. She was then kicked and thrown into the restroom.

This time the assailant was able to open the cash register. Keil identified Swafford at trial as the person who committed the crimes, although she had previously been unable to identify him.

The State then presented the testimony of Detective Gerald Shaft of the Salina Police Department. Shaft testified that as part of a drug sting operation the department had rented two apartments in a building in Salina. Shaft and another officer occupied one apartment, and Lamar Williams, a confidential informant, occupied the other. Williams' apartment was wired with videotape and sound so that the officers in the other apartment could monitor drug transactions.

At this point, the State sought to question Shaft as to certain statements Williams had made to him regarding information Anthony had given to Williams. Butler's attorney objected on the grounds of hearsay. The district court overruled the objection, citing the conspiracy exception to hearsay. Both Butler's and Swafford's attorneys lodged a continuing objection to the testimony.

Shaft then testified that Lamar Williams told him he had talked to Anthony prior to the crime and Anthony had asked him to participate in a robbery and murder at a motel. Shaft also testified that following the crime Anthony went to Williams' apartment to sell drugs. In a conversation that was both videotaped and audiotaped, Anthony told Williams about the crime and demonstrated how the murder had been committed.

Shaft also testified that he had interviewed Anthony after Anthony's arrest. At first, Anthony denied any involvement. After being told of the existence of the tapes, Anthony became visibly upset and unable to believe that Williams was working for the police. When another officer asked Anthony why he would commit such a crime, Anthony stated, "Because it was peer pressure." According to Shaft, Anthony also stated, "I'm going to get the Hard 40 for this."

Lamar Williams then testified. Williams stated that during the time the crime was committed he was working on drug buys for the police and knew all three defendants. According to Williams, Anthony told him he was going to rob the motel, Swafford was

going to knock out the clerk, and Anthony was going to slit the clerk's throat.

Williams testified that the night after the robbery and murder occurred, Anthony came to his apartment to sell drugs. While there, Anthony talked about the crime. Williams stated that Anthony had also talked about the previous robberies at the motel. Anthony had told Williams that he had a girl that would do anything for him and that the girl had made him a key to the motel. Anthony said that in the previous robberies, Swafford had gone into the motel and knocked out the clerk, Butler had been the lookout man outside, and Anthony had been the brains behind the operation.

Williams also testified that he had talked to Swafford about the murder of Bigler. All Swafford said was, "He was old, he was going to die anyway." When Williams told Swafford that Anthony had told him all about the murder, Swafford said, "Juan talked too much." Swafford also stated, "Man, we went up to that mother-fucker and—and the dude wouldn't give up so we had to fuck him up, man."

Mike Marshall, a sergeant with the Salina Police Department, testified that he was in the upstairs apartment while Anthony was describing the crime to Williams in the downstairs apartment. He identified the videotape and audiotape as the tapes made that night. The videotape and audiotape were played for the jury. They are not a part of the record on appeal.

Kelly Robbins, a KBI forensics examiner, also testified on behalf of the State. She stated that she found blood on the seats of the Geo Metro owned by Anthony's mother. There was also blood present on a t-shirt, a sock, and a pair of sweatpants found at Anthony's residence. According to Robbins, the blood on the sweatpants was consistent with Bigler's blood and could not have come from either Anthony or Swafford.

Florence Thompson, a friend of Butler, testified that Butler had come to her residence on August 14 and stated that the police were looking for him and that he was involved in the murder in Salina. Thompson advised Butler to turn himself in, which he did.

Chad Johnson, a worker at Alco, also testified on behalf of the State. Johnson testified that during the summer of 1992, he had copied a key for Butler.

Jennifer Harmon was called as a witness for the State. She admitted that she had been charged in the murder and robbery and had agreed to testify in exchange for the State's agreement to drop the murder charge. She stated that she was 17 at the time of the murder and had known Anthony since she was 11 years old. Anthony had previously worked at the restaurant at the Mid-America Inn, which was owned by Harmon's grandparents. Harmon stated that she returned to Salina in 1991 after living in Topeka for some time. She reestablished contact with Anthony, and they began a sexual relationship in the winter of 1991. Harmon stated that in April 1992, she began working at her grandparents' motel from 3 to 11 p.m.

Harmon testified that after the first attempted robbery of the motel, she went to Anthony's home and Swafford was there. As Swafford left, he asked Harmon "how the bitch was." Harmon testified that Anthony later told her that Swafford had gone into the motel and hit Ramona Keil on the head. Anthony stated that they had been unable to get into the cash register. Harmon told Anthony that the "room number" button had to be used to open the cash register.

Harmon stated that at one time she gave Anthony and Butler a ride to Junction City. On the trip, Anthony asked her to get him a copy of the keys to the motel. Defendant Butler also encouraged her to get the key for Anthony. Eventually, she agreed to leave the key where Anthony could pick it up and copy it.

After the second robbery at the motel, Harmon again went to Anthony's house. Anthony was outside with Swafford, and Swafford again asked her "how the bitch was." Later that summer, she was in Anthony's room when she noticed some walkie-talkies. Harmon testified that Anthony asked her if she would let him rob the motel while she was on duty so that he would not have to split the money with Swafford and Butler. Butler's attorney objected on the grounds of hearsay, but the objection was overruled. Harmon refused to agree to be robbed.

Harmon testified that she became scared of Anthony and wanted out of the relationship. She stated that she gave Anthony money and clothes so that he would stay out of trouble. According to

Harmon, Anthony was blackmailing her with a videotape of them having sex, which he threatened to expose.

Harmon stated that when she heard about the robbery and murder, she suspected Anthony. She went over to Anthony's house and found him sleeping; when she asked how he could sleep after what he had done, Anthony told her that he had "no conscience." Butler then arrived, and Harmon told him that they were all going to get caught. She mentioned that Butler had left some fried chicken at the crime scene and Butler stated, "I didn't take any chicken with me." Butler told her that he was not going to say anything and that if she and Anthony said nothing, no one would find out.

Butler presented an alibi defense. Kenneth Green testified that he had been at Mixon's party, left for a while, and then came back around 1:00 a.m. According to Green, he, Butler, and Swafford left to buy cigarettes soon after, drove by Benton's Cafe, and then went back to the party, where they all remained for the rest of the evening.

During deliberations, the jury sent a question to the judge concerning the redacted transcript of the videotape. The jury asked, "If we have established that Swafford and defendant Butler were there, can we use this as evidence?" The agreed-upon answer given to the jury by the trial judge was that the statement could not be used as evidence against Swafford and Butler. The jury also asked for a read-back of the cross-examination testimony of Harmon concerning fried chicken found at the crime scene. The district court proposed to read back both the direct and cross-examination in this area. Butler's attorney objected, arguing that the jury had asked only for the cross-examination. The district court found that both direct and cross-examination were necessary in order for the statements to be understood and overruled the objection.

Butler was convicted of felony murder and aggravated robbery. He was sentenced to a term of life for the felony murder and a term of 15 to life for the aggravated robbery, to run consecutively.

The defendant contends that the trial court committed reversible error in the following particulars: (1) denial of a motion for change of venue; (2) denial of a motion for dismissal of charges following preliminary hearing; (3) denial of a motion for severance;

(4) admission of the hearsay statements of Greer; (5) admission of other hearsay statements of the nontestifying codefendant Anthony; (6) erroneous jury instructions; (7) reading back testimony which was not requested by the jury; (8) denial of motions for a judgment of acquittal and for a new trial; and (9) sentencing the defendant. Finally, the defendant claims that the evidence was insufficient to sustain his convictions.

## CHANGE OF VENUE

Butler contends that the district court erred in denying his motion for change of venue because the pretrial publicity created so great a prejudice that he could not obtain a fair and impartial trial in Saline County. K.S.A. 22-2616(1) provides that the court shall, upon motion of the defendant, transfer the case to another county if it is satisfied that there is so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial in that county.

The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Lumbrera,* 252 Kan. 54, 57, 845 P.2d 609 (1992). The burden is on the defendant to show prejudice exists in the community not as a matter of speculation but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. 252 Kan. at 57.

As a threshold question, the State claims that Butler waived the change of venue issue by failing to renew the motion at the conclusion of jury selection. In support of this contention, the State cites *State v. Bierman,* 248 Kan. 80, 88, 805 P.2d 25 (1991) and *State v. Richard,* 235 Kan. 355, 365, 681 P.2d 612 (1984). Neither of these cases stand for the proposition that a defendant must renew the motion immediately following voir dire or see the objection waived. Rather, each of these cases notes that the defendants chose not to renew their requests at any time after the completion of voir dire, indicating that nothing new had arisen during voir dire that would show problems with finding an impartial jury. See *State*

*v. Bierman*, 248 Kan. at 88; *State v. Richard*, 235 Kan. at 365. Butler's attorney renewed his request for change of venue the next day. We find no merit in the State's argument that the motion for change of venue was waived.

Butler argues that the nature of the pretrial publicity created overwhelming prejudice. It is true that the crime and the arrest of the defendants were highly publicized. However, media publicity alone has never established prejudice per se. *State v. Grissom*, 251 Kan. 851, 927, 840 P.2d 1142 (1992). The burden is on the defendant to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. 251 Kan. at 927.

The defendants presented a survey conducted by the Kansas State University Institute for Social and Behavioral Research in support of his motion. The survey consisted of an interview with 366 persons in the Salina area. It revealed that 97.5% of those surveyed had heard about the case and the suspects; 49% of those surveyed felt that the evidence was strong against all four suspects; and 15.8% of those surveyed felt the evidence was strong against some defendants and weak against others. Of those persons, 42.9% felt the evidence was strong against Butler. Thus, 56.3% of the total surveyed felt the evidence was strong against Butler. Of those surveyed, 18% felt that they could not be impartial if asked to serve on a jury, 9.3% felt it was unlikely they could be impartial, 24.3% felt that it was likely that they could be impartial, 29.9% felt that it was very likely that they could be impartial, and 18.6% had no opinion.

There were motions made by all defendants regarding individual voir dire. However, the district court denied the motions and determined instead that problems could be avoided by summoning different panels at different times to prevent contamination of the jury pool at large. Six separate panels of prospective jurors were summoned and questioned by the court and counsel. In denying the motion for individual voir dire, the court offered to revisit the motion if a problem occurred when picking a jury.

The record reveals that each of the defendants' counsel asked questions regarding pretrial publicity, including whether the jurors

had formed an opinion and whether that opinion was strong against one or all three defendants. Of the first panel of 18 jurors, 5 jurors indicated that pretrial publicity had led them to form an opinion, and they were dismissed for cause. The judge also asked questions of the jury regarding pretrial publicity at juror orientation. In the second panel, Swafford's attorney asked for a show of hands from those people who felt Swafford was guilty. The two persons who indicated they felt that he was guilty were dismissed for cause. All attorneys asked questions of the third panel concerning publicity. From the third panel, five persons said they had been affected by the pretrial publicity, but only two of those five were asked to be stricken by the defense attorneys. Those two were stricken for cause.

On the fourth panel of 25 jurors, 12 felt that they knew a great deal about the case and had at least started to form their own opinions. Of those 12, 10 were asked to be stricken for cause. Seven of those were stricken, but three who claimed that they would try to be impartial were left on. Both the judge and the attorneys asked questions about publicity. Of the fifth panel of 24, only 2 stated that they might have formed an opinion, and both stated that they could set that aside and be impartial. However, one was dismissed for cause. On the last panel of 25, only 2 expressed an opinion of the case, and they were dismissed for cause.

The court qualified 90 of the jurors for use on the jury panel. Each defendant then received 12 peremptory strikes, and the State received 36 strikes. The defense struck the three persons challenged for cause on the third panel that had not been stricken for cause.

On the whole, the court questioned only 125 jurors to arrive at a jury pool of 90. The record discloses that the attorneys had few, if any, problems in questioning jury members about the effects of publicity. All but three of the challenges for cause because of pretrial publicity were granted, and the remaining three challenged venirepersons were taken off by peremptory strikes. The whole selection process lasted two days. Although jury selection was drawn out due to the district court's precautions, it was not inor-

dinately difficult to pass a pool of jurors for cause. No objections were made about the process following the selection.

We conclude that the court did not abuse its discretion in denying Butler's motion for change of venue. In concluding our discussion of this contention, the following quote from *State v. Ruebke,* 240 Kan. 493, 500-01, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), is appropriate:

> "Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice. There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue."

## MOTION TO DISMISS AFTER THE PRELIMINARY HEARING

Butler next argues that the district court erred in failing to dismiss the case after the evidence was presented at the preliminary hearing. He argues that the only evidence presented at the preliminary hearing connecting him to the crime was the inadmissible hearsay of Greer.

In order to bind a defendant over for arraignment and trial, the State must present evidence at a preliminary hearing sufficient to show that it appears a felony crime was committed and that probable cause exists to believe that the defendant committed the crime. *State v. Palmer,* 248 Kan. 681, 688, 810 P.2d 734 (1991). Probable cause at a preliminary hearing signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain reasonable belief of the accused's guilt. *State v. Chapman,* 252 Kan. 606, 620, 847 P.2d 1247 (1993).

We have held that the sufficiency of a preliminary examination may be challenged only by a motion to dismiss or grant appropriate relief filed in the district court. *State v. Lashley,* 233 Kan. 620, 624,

664 P. 2d 1358 (1983). Failure to challenge in this manner amounts to waiver. In this case the defendant properly filed a motion to dismiss before the district court regarding the sufficiency of the preliminary hearing. Thus, we are faced with the issue of whether a defendant who has been found guilty before the district court may successfully challenge his conviction on appeal, claiming that evidence at the preliminary hearing was insufficient to bind him over for trial on that charge.

The evidence providing the basis for binding Butler over to stand trial on charges of murder and aggravated robbery came from Greer. She testified that Anthony told her he, Butler, and Swafford were going to rob the motel and injure the clerk. This testimony is unquestionably hearsay and would be inadmissible absent an exception.

The State contended at the hearing that the evidence fell under the coconspirator exception to hearsay found in K.S.A. 60-460(i)(2), and the evidence was admitted on these grounds. This statute provides an exception to the hearsay rule for those statements

"which would be admissible if made by the declarant at a hearing if . . . the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

Even if the requirements of the statute are satisfied, there must be evidence absent the hearsay statements which establishes some substantial factual basis for the existence of a conspiracy. *State v. Schultz*, 252 Kan. 819, 842, 850 P.2d 818 (1993).

Butler contends that the evidence presented by the State at the preliminary hearing was not sufficient to establish that a conspiracy existed or that he was a part of it. In order to meet the requirements for admission as the statement of a coconspirator, there must be evidence other than the proffered out-of-court statement which establishes a "substantial factual" basis for a conspiracy between the defendant and the declarant. *State v. Bird*, 238 Kan. 160, 176, 708 P.2d 946 (1985). When proof of a conspiracy depends upon circumstantial evidence, prima facie proof of the conspiracy prior

to the introduction of the proffered out-of-court statement cannot be required, and when the whole of the evidence introduced at trial shows a conspiracy, the statement is admissible. 238 Kan. at 176; *State v. Schultz*, 252 Kan. at 842.

In this case, the only evidence presented by the State at the preliminary hearing, absent the hearsay statements themselves, which would have established a conspiracy was that: (1) a Marlboro cigarette was found in the motel parking lot and Butler sometimes smoked Marlboros; (2) the evidence suggested that more than one person was involved in the robbery; (3) some property belonging to Butler was found in the baggage compartment of the car known to be driven by Anthony; and (4) Butler lived at Anthony's house. While this evidence may show that a conspiracy existed, it does not establish the required substantial factual basis from which a reasonable person could infer that Anthony and Butler were coconspirators or that Butler was involved in the crime. Therefore, the district court erred in admitting the hearsay statements at the preliminary hearing under the coconspirator exception.

Although the district court erred in binding over Butler for trial, this error does not necessarily require reversal. A preliminary hearing is not a trial of a defendant's guilt or innocence but rather an inquiry as to whether the defendant should be held for trial; its principal purpose is the determination of whether a crime has been committed and whether there is a probability that the defendant committed a crime. *State v. Wimberly*, 246 Kan. 200, 209, 787 P.2d 729 (1990). As such, it fulfills the function of a grand jury proceeding.

The United States Supreme Court has held that when an error occurs in a grand jury proceeding, automatic reversal is not required where the accused has gone to trial and has been found guilty beyond a reasonable doubt. *United States v. Mechanik*, 475 U.S. 66, 70, 89 L. Ed. 2d 50, 106 S. Ct. 938 (1986). The Court explained:

"[T]here is no simple way after the verdict to restore the defendant to the position in which he would have been had the indictment been dismissed before trial. He will already have suffered whatever inconvenience, expense and opprobrium that

a proper indictment may have spared him. In courtroom proceedings as elsewhere, 'the moving finger writes; and, having writ, moves on.' " 475 U.S. at 71.

Other states have applied a harmless error standard when a defendant has been improperly bound over for trial after a preliminary hearing. See *People v. Pompa-Ortiz*, 27 Cal. 3d 519, 165 Cal. Rptr. 851, 612 P.2d 941 (1980); *People v. Alexander*, 663 P.2d 1024, 1025-26 (Colo. 1983); *People v. Hall*, 435 Mich. 599, 615-16, 460 N.W.2d 520 (1990). But see *State v. Boyd*, 214 Conn. 132, 141, 570 A.2d 1125 (1990) (holding that insufficient evidence at the preliminary hearing stage is a jurisdictional defect). As stated by the court in *Hall*: "To require automatic reversal of an otherwise valid conviction for an error which is harmless constitutes an inexcusable waste of judicial resources and contorts the preliminary examination screening process so as to protect the guilty rather than the innocent." 435 Mich. at 614.

We hold that where an accused has gone to trial and been found guilty beyond a reasonable doubt, any error at the preliminary hearing stage is harmless unless it appears that the error caused prejudice at trial.

In this case, Butler went to trial and was convicted by a jury of the crimes charged. At trial, the State presented sufficient evidence to establish that a conspiracy existed and that Butler was a part of this conspiracy. Therefore, even if the district court erred in binding Butler over for trial based on the hearsay statements of Greer, we hold that such error did not affect the subsequent proceedings and was therefore harmless.

## MOTION FOR SEVERANCE

Butler contends that the district court erred in denying his motion for severance. Severance lies within the sound discretion of the trial court. The burden is on the movant to present sufficient grounds to establish actual prejudice. *State v. Hunter*, 241 Kan. at 632-33.

K.S.A. 22-3202(3) governs the disposition of defendant's contention and provides that two or more defendants may be charged in the same complaint, information, or indictment if they are alleged to have participated in the same act or series of acts consti-

tuting the crime or crimes. Two or more defendants may be later joined for trial if the defendants could have been charged in the same complaint, information, or indictment.

Some of the factors to be considered in determining whether there is sufficient prejudice to mandate severance are:

" '(1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants.' " *State v. Martin*, 234 Kan. 548, 549, 673 P.2d 104 (1984) (quoting 75 Am. Jur. 2d, Trial § 20).

Butler contends that the videotaped and audiotaped statements of Anthony served to cause prejudice, even though his name was excised from the tapes. The problem with his argument is that the tapes are not part of the record on appeal. As a result, it is not possible to determine what effect the tapes might have had on the jury and whether they would have prejudiced the jury as to Butler.

### HEARSAY STATEMENTS - KAREN RENEE GREER

Butler contends that the district court erred in admitting the testimony of Greer as to statements made to her by Anthony. This is essentially the same argument that Butler makes concerning Greer's testimony at the preliminary hearing stage.

Once again, the State argued at trial that these statements were admissible under the coconspirator exception. Therefore, the question is whether the evidence adduced at trial, absent the hearsay statements, establishes some substantial factual basis for the existence of a conspiracy. We note that in order for a court to conclude that a factual basis for a conspiracy exists, the evidence must establish not only that there is a substantial basis for the existence of some conspiracy but that the conspiracy actually involved the defendant. See *State v. Bird*, 238 Kan. at 176.

Our review of the record indicates that earlier in the summer Butler and Anthony were attempting to persuade Jennifer Harmon

to make a copy of the motel key for Anthony. Additionally, there is evidence that Butler copied a key to the motel that summer. Harmon also stated that sometime after the robbery she told Butler that he was going to get caught because he had left some fried chicken at the scene, to which Butler replied, "I didn't take any chicken with me." Furthermore, there is Butler's own statement to Florence Thompson that he was involved in the murder in Salina.

Based on this evidence, we conclude that there was a substantial factual basis from which a reasonable person could infer that Butler was involved in a conspiracy with Anthony. Thus, the district court did not err in admitting the statements.

## HEARSAY STATEMENTS - CODEFENDANT JUAN ANTHONY

Butler also argues that the district court erred in admitting other statements made by Anthony to others. He argues that because Anthony was a codefendant and did not testify, his statements were hearsay, and without this inadmissible hearsay there is little evidence to connect him to the crime.

Butler first complains that Lamar Williams was allowed to testify that he was the lookout man in the previous robberies. However, Butler did not object to that statement at trial. The objection he cites refers to comments contained in the audiotape of Anthony's statement.

Butler also complains of statements made by Anthony to Jennifer Harmon concerning his participation in the prior robbery. However, these statements were made before the robbery and are admissible under the coconspirator hearsay exception. Butler further states that certain letters from Anthony to Harmon are inadmissible. However, these letters, which state that neither Anthony nor anyone else has said anything to the police, do not implicate Butler and are admissible, not for the truth of the matter asserted, but to show that more than one person was involved in the crime. We conclude that the complained-of evidence is not inadmissible hearsay.

## JURY INSTRUCTIONS

Butler contends that the instructions below were erroneous and require reversal. When the defendant questions the giving of jury instructions, the standard of review is as follows: " 'If jury instructions properly and fairly state the law as applied to the facts in the case when considered as a whole, and if the jury could not reasonably be misled by them, the instructions should be approved on appeal.' " *State v. DeVries*, 13 Kan. App. 2d 609, 611-12, 780 P.2d 1118 (1989) (quoting *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 92, 671 P.2d 491 [1983]).

Butler complains of instructions on aiding and abetting because he was not charged with aiding and abetting. However, Butler's objection at trial to these was based on his claim that the instructions were duplicitous. A party may not assign as error the giving or failure to give an instruction absent an objection to the instruction stating the specific grounds for the objection unless the instruction or failure to give the instruction was clearly erroneous. *State v. Edwards*, 252 Kan. 860, Syl. ¶ 3, 852 P.2d 98 (1993).

We have held that a trial court may give instructions on aiding and abetting even though the defendant was not charged with aiding and abetting. See *State v. Mack*, 255 Kan. 21, 30, 871 P.2d 1265 (1994). In this case, there was evidence that Butler aided and abetted Anthony in the commission of the crime.

Butler also argues that the court erred in giving Instruction 14, concerning intentional conduct, to the jury. He argues that the court should have given PIK Crim. 3d 54.01-A instead.

Instruction 14 states:

"In order for the defendants to be guilty of the crimes charged the State must prove that their conduct was intentional. Intentional means willful and purposeful and not accidental.

"Intent is a state of mind existing at the time a person commits an offense, and intent may be shown by act, circumstances and inferences deducible therefrom.

"Intent or lack of intent is to be determined or inferred from all the evidence in the case."

Butler argues that the district court should have given PIK Crim. 3d 54.01-A, which states:

"In order for the defendant to be guilty of the crime charged, the state must prove that [his] conduct was intentional. Intentional means willful and purposeful and not accidental.

"Intent or lack of intent, is to be determined or inferred from all the evidence in the case."

Butler contends that the court's addition of the middle paragraph unduly supported the State's theory of the case and was unnecessary.

"The use of PIK instructions is not mandatory, but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed. [Citation omitted.]" *State v. Dunn*, 249 Kan. 488, 492-93, 820 P.2d 412 (1991).

We conclude that while the addition to the PIK instruction given was perhaps unnecessary, it was a correct statement of the law tailored to the facts of this case and was not prejudicial. The giving of this instruction, therefore, provides no basis for reversal of defendant's convictions.

Butler also contends that jury Instruction 16 also prejudiced him. It stated:

"Evidence has been admitted tending to prove that some or all of the defendants committed crimes other than the present crime charged. This evidence must be weighed with respect to each defendant and may be considered solely for the purpose of proving each defendant's plan, preparation, knowledge or identity."

Butler's argument is that the word "one" should have been substituted for the word "some." He argues that this confused the jury into thinking that they had to find that more than one of the defendants committed crimes other than the present crime. However, the evidence showed that both Swafford and Anthony might have committed previous crimes. Therefore, the instruction fairly stated the evidence admitted.

Another instruction with which Butler finds fault is Instruction 16A, which defines conspiracy. Butler contends that he was never

charged with conspiracy and, therefore, the instruction was prejudicial.

The court found that this instruction was required to give a reasonable explanation for the evidence which was admitted. The State argues that because it was using evidence under the conspiracy exception to hearsay, the instruction was required.

However, the determination of whether a conspiracy exists for purpose of the hearsay exception rests with the judge not the jury. Therefore, the instruction on conspiracy was not necessary and was error. Nevertheless, the error was harmless. Although the jury was instructed as to what constitutes a conspiracy, Butler fails to show how this information could have prejudiced the jury against him.

Finally, Butler argues that the jury should have been instructed separately as to each defendant. He argues that it was prejudicial for the jury to be instructed on crimes for which he was not charged. An examination of the instructions shows that a reasonable juror could not have been misled by the failure of the court to instruct separately.

## READ-BACK OF TESTIMONY NOT REQUESTED BY JURY

As part of a request from the jury to read back certain testimony, the jury asked that the cross-examination by Butler's counsel of Jennifer Harmon regarding chicken found at the scene be read back. Initially, the court indicated that the jury probably wanted both direct and cross-examination read-back. Defense counsel, however, objected to any reading back of the direct-examination. The following exchange between counsel and the court took place:

"The Court: Mr. Price [Defense Counsel] has an objection to reading of the direct testimony with regard to the chicken since, as I recall the jury's note, [it] had only asked for the cross-examination regarding the chicken.

"Mr. Price: That's a correct statement of my objection.

"[Prosecutor]: Judge, on a readback, to read the direct and/or to read the cross and not the direct, doesn't give, in my opinion, reflection back to the jury what the testimony relates to. If the request was to read the direct, I'm sure that the cross would have been read as well. I think the direct needs to be read in order for the cross to be understood.

. . . .

"The Court: Well, I agree with counsel for the State on that one: that it's a fairly brief testimony. It's not going to be any onerous situation and I believe that the—

the—to read one without the other would take it complete out of context and it—the objection will be noted for the record and overruled."

We recently had an opportunity to address the issue concerning the trial court's duty to read back testimony requested by a jury. In *State v. Meyer*, 255 Kan. 3, 872 P.2d 236 (1994), we held that the provisions of K.S.A. 22-3423 require the trial court to accede to a jury's request to read back testimony. However, we also noted that the manner of acceding to such a request is subject to the trial court's discretion. 255 Kan. 3, Syl. ¶ 1.

In *Meyer*, we reversed because the trial judge failed to respond to the jury's somewhat confusing request for a read-back of certain testimony. We indicated in *Meyer* that the trial court's response to the jury's question was neither responsive nor helpful. 255 Kan. at 5. We further concluded:

"K.S.A. 22-3420(3) states that the testimony 'shall be read.' A trial court is required to accede to a jury's request to read back testimony. *We do not believe, however, that such a strict construction forecloses all trial court discretion as to the manner of acceding to the request.* Both *Ruebke* and *Redford* are consistent in the view that the trial court has the discretion to control the read-back. The trial court is free to clarify the jury's read-back request where the read-back request is unclear or too broad, or the read-back would jeopardize the manageability of the trial. Discretion rests with the trial court to clarify and focus the jury's inquiry." (Emphasis added.) 255 Kan. at 8.

In this case, the trial court complied with the provisions of K.S.A. 22-3420(3). It provided the jury with the precise information the jury had requested. In addition, the trial court read back additional testimony in the form of the direct examination concerning the same subject, which direct examination was not requested by the defendant. However, as the court noted, many times context requires reading of both direct and cross-examination concerning the same subject. Under the circumstances, we do not believe the trial court abused its discretion in providing the jury more information than the jury had requested.

Nothing in *Meyer* prevents the court from providing the jury with more information than is requested. Oftentimes, testimony read back out of context makes no sense, or may distort the meaning of the information, or in some instances, may mislead the jury.

We leave these matters up to the sound discretion of the trial court. The information requested by the jury in this case was given to the jury in accord with K.S.A. 22-3420(3). We conclude that the decision of the trial court to place the testimony in context by reading back the direct examination on the same subject matter was not an abuse of discretion.

## MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

The defendant's motions for acquittal and new trial raise all of those issues that we have dealt with in the other nine allegations of error treated in this opinion. No independent analysis and resolution is therefore required.

## SENTENCING

Butler argues that his sentences for felony murder and the underlying crime of aggravated robbery constitute double jeopardy. He argues that to be sentenced both for felony murder and for the underlying felony results in multiple punishments for the same offense. Accordingly, he asks us to vacate the sentence imposed.

This exact issue has twice been addressed by this court. In *State v. Dunn*, 243 Kan. 414, 433, 758 P.2d 718 (1988), we determined that conviction and sentencing for both felony murder and the underlying offense do not constitute double jeopardy. We reached the same result in *State v. Gonzales*, 245 Kan. 691, 706-707, 783 P.2d 1239 (1989) and *State v. Bailey*, 247 Kan. 330, 340, 799 P.2d 977 (1990), *cert. denied* 114 L. Ed. 2d 108 (1991).

Butler acknowledges our decisions in these cases but asks us to look anew at the situation. He argues that because the underlying felony is used to convict the defendant of first-degree murder, then all underlying felonies are lesser included offenses of felony murder. Butler's argument is unpersuasive. We adhere to the rationale in *Dunn, Gonzales,* and *Bailey.*

## SUFFICIENCY OF EVIDENCE

Butler's final argument is that the evidence was insufficient to sustain his conviction.

" 'When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.' *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990)." *State v. Evans*, 251 Kan. 132, 135-36, 834 P.2d 335 (1992).

Butler argues that when the inadmissible hearsay testimony is excluded, there is not sufficient evidence to sustain his conviction. However, as addressed above, the hearsay testimony was not improperly admitted. This testimony provides evidence from which a reasonable jury could have found Butler guilty beyond a reasonable doubt.

Affirmed.

ALLEGRUCCI, J., dissenting: I agree with the majority on the issues raised by the defendant except as to Syl. ¶ 7 and the corresponding portion of the opinion.

K.S.A. 1994 Supp. 22-2902(1) states: "Every person arrested on a warrant charging a felony or served with a summons charging a felony shall have a right to a preliminary examination before a magistrate, unless such warrant has been issued as a result of an indictment by a grand jury." Clearly, unless waived, the defendant has a right to a preliminary hearing. A preliminary hearing is jurisdictional, and, absent a preliminary hearing or waiver, the district court does not have jurisdiction to proceed with a felony criminal prosecution in the district court.

In *State v. Boyd*, 214 Conn. 132, 141, 570 A.2d 1125 (1990), a very similar fact situation was before the Connecticut Supreme Court. The court concluded:

"[W]e hold that Wilson's statement was inadmissible on evidentiary grounds. Therefore, the trial court erred in admitting the statement at the defendant's probable cause hearing. Thus, since Wilson's statement was the only evidence offered by the state at the probable cause hearing that effectively implicated the defendant in Ann Viner's murder, and since our decision in *State v. McPhail*, [213 Conn. 161, 170, 567 A.2d 812 (1989),] states that 'insufficiency of the evidence presented at the probable cause hearing will deprive the trial court of jurisdiction over the person of the defendant,' the defendant's subsequent prosecution and conviction is rendered moot."

I agree that where harmless error occurs at the preliminary hearing, the district court has jurisdiction to proceed with the arraignment and trial. However, error is harmless if, absent the error, the magistrate could have found from the evidence that it appeared a felony had been committed and there was probable cause to believe the defendant committed it. Under Syl. ¶ 7 of the majority opinion, I cannot conceive of any error that would not be harmless. The majority, in effect, renders the defendant's right to a preliminary hearing under K.S.A. 1994 Supp. 22-2902 meaningless. The State could simply file the information directly in the district court and proceed with arraignment and trial. In such a case, the prejudice to a defendant would be no greater than in the present case. Here, the majority states that the evidence, absent the hearsay statement of Greer, "does not establish the required substantial factual basis from which a reasonable person could infer that Anthony and Butler were coconspirators or that Butler was involved in the crime. Therefore, the district court erred in admitting the hearsay statements at the preliminary hearing under the coconspirator exception." Absent that statement, there was no evidence presented at the preliminary hearing to support the finding by the magistrate judge that there was probable cause the defendant committed the crime as charged in the complaint.

In *Boyd*, the majority stated:

"The dissent asserts that remanding this case for a new trial, after no error was found in the defendant's first trial, is 'a flagrant waste of judicial resources and imposes a wholly unnecessary hardship on the family of the victim in being required to undergo the trauma of a second trial.' We agree that, just like all cases that are remanded for a new trial following a finding of harmful error, another trial in this case will be traumatic. Nonetheless, we do not believe that this consideration warrants the abandonment of protecting constitutional principles. As Justice Thurgood Marshall of the United States Supreme Court stated in his dissent in *Guardians Assn. v. Civil Service Commission*, 463 U.S. 582, 626, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983), 'a right without an effective remedy has little meaning.' " 214 Conn. at 141 n.11.

In the present case, I ask the majority, what is the meaning of the right to a preliminary hearing if there is no remedy? The defendant filed a timely motion challenging the sufficiency of the preliminary hearing, which the majority finds has merit. Yet, the majority sim-

ply says the error is harmless because it did not cause prejudice at trial. If insufficient evidence to establish probable cause at a preliminary hearing is not prejudicial to the defendant, then what is?

I cannot accept the majority's denying the defendant a right to a preliminary hearing, and I would set aside the defendant's convictions and remand for further proceedings.

HOLMES, C.J., joins the foregoing dissenting opinion.