NOT DESIGNATED FOR PUBLICATION

No. 113,540

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SCOTT M. WEIGEL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lincoln District Court; KIM W. CUDNEY, judge. Opinion filed August 5, 2016. Affirmed.

*Debra J. Wilson*, capital and conflicts appellate defender, of Capital Appeals and Conflicts Office, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MCANANY and ATCHESON, JJ.

*Per Curiam*: The State charged Scott M. Weigel with intentional second-degree murder. He was found guilty by a jury of unintentional second-degree murder. On appeal, Weigel contends (1) that the evidence was insufficient to sustain his conviction of unintentional second-degree murder; (2) that the trial court erred when it failed to instruct the jury on involuntary manslaughter as a lesser included offense of unintentional second-degree murder; (3) that the trial court erred when it denied his motion to dismiss for insufficient evidence following his preliminary hearing on the sole count of intentional

1

second-degree murder; (4) that the trial court erred in allowing the State to amend the complaint against him after the commencement of the trial; and (5) that the trial court erred in allowing the admission of gruesome autopsy photographs. Finding no reversible error, we affirm.

This case arises from a common tragedy which occurs when individuals combine the consumption of alcohol with the handling of a loaded firearm. There is no dispute that in the early morning hours of September 9, 2013, 19-year-old Keith Ancell was fatally shot with a Glock-19 semiautomatic handgun while held by the defendant, Scott M. Weigel. The jury was taxed with several questions: whether Weigel intentionally shot Ancell, whether Weigel acted with sufficient recklessness to constitute unintentional second-degree murder when he shot Ancell, or whether Weigel's shooting of Ancell was merely accidental.

Weigel was originally charged in Lincoln County District Court with one count of intentional second-degree murder as a result of Ancell's death. After approximately 14 months, Weigel's case was set for a jury trial. One month before trial, defense counsel provided the State with the curriculum vitae of its proposed expert witness. The State, however, was provided with no other additional information. The expert's written report was furnished to the State 1 business day before trial.

On the second day of trial, the parties discussed the State's desire to amend the information to add an alternative charge of reckless second-degree murder. The State had included the elements instruction for this alternative charge in its pretrial instructions. Defense counsel vigorously opposed the motion on a variety of grounds. The State argued, however, that the evidence would be the same for either offense. The trial court granted the motion to amend. In doing so, the court determined that the amended charge was not a new or different crime and that the evidence involved would be the same.

2

The facts surrounding the shooting of Ancell are as follows:

On September 8, 2013, Weigel, Ancell, and Ancell's friend, Dakotah Eidet, were riding four-wheelers and drinking alcohol at Weigel's home in Lincoln, Kansas. Ancell called his friend, Brittany Strathman, and persuaded her to come over to Weigel's house. After Brittany arrived at about 10 p.m., they decided to drive to Ellsworth, Kansas, to buy soda to mix with their drinks. The foursome set off for Ellsworth in Weigel's Hummer, with Weigel driving. After several miles, Brittany persuaded Weigel to let her drive because he had been drinking and was driving unsafely.

When they arrived in Ellsworth, Brittany walked into the convenience store to buy soda. During that time, Weigel showed Eidet and Ancell a Glock handgun he had purchased. Weigel removed the clip from the handgun before allowing others to handle it. Eidet and Weigel testified that Ancell walked into the store with Brittany, although Brittany testified that Ancell was in the car when Weigel first got out the handgun. Either way, Brittany and Eidet agreed that the handgun was still being passed around after Ancell returned to the car. When Brittany returned to the vehicle after two trips into the store, she saw the men handling the gun. Brittany made sure they took the clip out of the handgun, and she saw Weigel place the magazine in the glove box. The men continued to pass the unloaded gun around and finally Brittany told them to put it away. Weigel then placed the gun in the glove box in front of him. Brittany testified that the magazine had been removed from the handgun when it was placed in the glove box.

When the group left the convenience store, Brittany drove, Weigel was in the front passenger seat, Ancell sat behind Brittany, and Eidet sat behind Weigel. They were heading toward Weigel's house, but Weigel directed Brittany to drive through the town of Lincoln. They stopped on School Road near a house where Weigel stated that they could steal some beer. Both Weigel and Ancell left the vehicle and stood by the passenger side of the car talking. After a few minutes, Weigel returned to the front passenger seat while

3

Ancell remained outside the car on the passenger side talking to Weigel and Eidet through the open windows. Brittany remained in the driver's seat.

The trial testimony about the actual shooting diverged at this point. Brittany testified that while the men were talking, she looked away and when she looked back Weigel had the handgun in his hand. Brittany testified that Weigel waved the handgun around toward Ancell, repeatedly telling him to get into the car. Ancell did not respond. Weigel continued to yell at Ancell. Brittany looked away briefly and she heard a shot. Weigel got out of the car with the gun still in his hand. Brittany could hear Ancell coughing. Brittany got out of the Hummer and walked around the car. She saw Ancell on the ground. Both Brittany and a neighbor called 911. Brittany saw Weigel drop the handgun on the ground by Ancell. A shell casing was found outside of the Hummer on the passenger side near the rear tire.

Brittany also gave a handwritten statement to police. She stated that after they stopped on School Road, Weigel had returned to the car and took his handgun out of the glove box. She wrote that Weigel was waving the gun around in the air "jokingly" and telling Ancell to get in the car. On cross-examination, Brittany admitted stating in her 911 call that Weigel and Ancell were "dicking around" and shots were fired. Moreover, she told the 911 dispatcher that "he didn't realize that the gun was loaded." She also admitted telling a KBI agent that she did not think Weigel knew the gun was loaded.

Eidet testified that Ancell was standing outside the passenger side of the car, joking around with the occupants when Weigel pulled the gun out of the glove box and told Ancell to get back in the "fucking Hummer." Eidet further testified that Ancell refused to do so "while the gun was pointed at him." According to Eidet, Weigel cocked the gun and repeated his command for Ancell to get in the vehicle. Ancell again refused and Weigel shot Ancell. Eidet testified that he saw the gun fire and saw Ancell fall. He testified that Weigel dropped the gun, got out of the vehicle, and asked Ancell if he was

4

okay. He also testified that he got out of the car and ran to the nearby police station where he remained and gave a written statement to police.

At trial, Eidet's handwritten statement was admitted into evidence. In the handwritten statement, Eidet wrote that he had gone with the group to Ellsworth and then they returned to Lincoln. He reported he was in the back seat texting his girlfriend while Weigel and Ancell were talking. Eidet repeated his testimony about Weigel pointing a gun at Ancell and telling Ancell to get back in the vehicle; he wrote that Ancell refused to move while a gun was pointed at him. Eidet then wrote that he thought Weigel and Ancell were playing around and that he did not pay much attention. While Eidet was looking at his phone, he heard Weigel make his demand again and Ancell refused. Then he heard a pop, looked up, and saw Ancell fall. Weigel got out of the car and screamed for someone to dial 911.

Later, Eidet gave a statement to KBI agents during which he remembered other information. In his second statement, he reported seeing Weigel holding the gun in his right hand and using his left hand to pull the slide back to chamber a bullet; he also remembered Weigel pulling the slide back before Ancell was shot. During cross-examination, Eidet admitted that it was very dark outside, there were no street lights in the area, and neither the vehicle headlights nor interior lights were illuminated. Eidet agreed that in his written statement he had indicated he was focused on his phone when he heard the shot. Eidet also admitted he had talked to Ancell's father several times before giving his second statement to the KBI.

A local sheriff's deputy actually heard a shot while leaving the office in Lincoln at about 1:40 a.m. The deputy was notified very shortly afterwards about a 911 call and drove his patrol car to the scene. Upon arrival, the deputy saw a handgun on the ground and checked Ancell to determine if he had a pulse or was breathing. He found no signs of life. When the E.M.T.'s arrived, they placed a monitor on Ancell's body to confirm there

5

were no vital signs. Both the deputy and the EMT testified Ancell's body was 2 to 3 feet from the vehicle. When police arrived at the scene, they found Ancell lying on his back with a semiautomatic handgun within a couple of feet of Ancell's body. Ancell's feet were 2.1 feet from the curb. Weigel was asked to sit on the curb and the deputy got his camera and took photographs of the scene. While the deputy photographed the scene, Undersheriff Dustin Florence and Sheriff Mike Weigel arrived at the scene. The sheriff asked the deputy to take Weigel to the sheriff's office. The sheriff stated that Weigel was his son.

The KBI was called in to investigate the case. KBI agents Cory Latham and Brian Carroll, part of a state-wide crime scene team, were called in to assist. Latham arrived in Lincoln at approximately 6:20 a.m., and Carroll arrived at approximately 7:30 a.m. Latham obtained information from local law enforcement and began photographing the scene. He also was waiting for a search warrant to arrive to allow a search of the vehicle. Latham's pictures were similar to those taken by the local sheriff's department—showing the vehicle, the location of Ancell's body in relation to the vehicle and handgun, and the location of the spent shell casing.

Meanwhile, Carroll diagrammed the scene, comparing the location of the Hummer, the body, the handgun, and an empty plastic cup near the body. Carroll collected DNA evidence from Weigel's hands, one of which was stained, and Latham photographed Weigel. The DNA samples taken from Weigel's hands matched blood samples obtained from Ancell's body. Senior Special Agent Kelly Snyder was the KBI agent in charge of the investigation. Snyder obtained search warrants, including a search warrant to take a blood sample from Weigel; the blood sample was taken at 9:40 a.m., approximately 8 hours after the shooting. Weigel's blood alcohol test result was 0.09 grams per 100 milliliters of blood. Weigel admitted he did not consume any alcohol after the shooting.

Agent Latham collected the firearm at the scene. He testified that the handgun was a Glock-19 semiautomatic pistol. Latham determined that there were 13 rounds in the magazine and one round in the chamber of the gun. The magazine was firmly seated in the handgun, and the magazine had a capacity of 15 bullets.

A KBI firearms expert testified that he examined the Glock-19 in this case and found that all of the safety mechanisms seemed to be functioning, except for the drop-safety mechanism, which he did not test. The trigger pull required approximately 7-1/4 pounds of force in order for the gun to fire, which was higher than the manufacturer's stated specifications, but not unusual. He also test-fired the gun and microscopically compared the test bullets and shell casings with the ones obtained from the scene. He concluded that they came from the same firearm.

The defense thoroughly cross-examined all the KBI agents. Snyder was questioned as to why he had decided to forego testing on Ancell's T-shirt to determine the distance between Ancell and the handgun and why the handgun was not tested for fingerprints or DNA. During his cross-examination, Agent Carroll admitted that if a person grabbed a barrel of a gun there might be DNA or fingerprints left on the barrel, but it was not likely. Carroll did not see any blood on the weapon when he examined it. A different agent observing the autopsy testified that ferrotrace testing was done on Ancell's hands at the coroner's direction and both palms reacted, indicating certain metals were present on his hands.

The coroner, Dr. Altaf Hossain, testified that Ancell died from exsanguination after being shot in the chest. The bullet passed through Ancell's sternum, through his aorta, and came to rest in his back between the fourth and fifth rib. Because of the damage to the aorta, Ancell's chest filled with blood in a manner that would cause immediate death. Dr. Hossain testified that there was no evidence that the barrel of the gun was imprinted on Ancell chest as would occur if the barrel had been in contact with

7

the skin when fired. Dr. Hossain examined Ancell's T-shirt and found no obvious signs of stippling—gun powder residue indicating a close proximity between the gun and the victim. Hossain, however, did not have the capacity to conduct detailed tests for stippling, so he gave the T-shirt to the KBI. Dr. Hossain did spray ferrotrace on Ancell's hands showing that his hands had been in contact with some type of iron product, which could include a radiator, a metal windmill (there was testimony that Ancell had climbed a windmill), or any other item made with iron. Nevertheless, contact with a handgun that was made of polymer like the Glock-19, would not leave a trace using ferrotrace. In addition, the ferrotrace on Ancell's hands showed no pattern. On the other hand, if a person was holding a handgun there would be an observable pattern. Dr. Hossain also took various biological samples from Ancell's body; a third-party laboratory confirmed that Ancell's blood alcohol level was approximately 0.135 percent.

After the State rested its case, Weigel moved for judgment of acquittal, which was denied. The defense called Weigel as its first witness. Weigel's testimony significantly differed from those of the other witnesses.

Weigel, who was 34 years old when the trial began, testified that he had known Ancell since Ancell was a young boy. Weigel considered Ancell to be his best friend. Weigel met Eidet through work about 6 months before the shooting. Weigel testified that Ancell and Eidet came to his house the evening of September 8, 2013. They were riding four-wheelers and drinking. Weigel testified he had two mixed drinks that evening. Brittany, whom Weigel had not met before that evening, was the only person not drinking. Weigel testified that after Brittany arrived around 10:30 p.m., the foursome drove to Ellsworth in his black Hummer. According to Weigel, both Brittany and Ancell went into the convenience store, and he showed his Glock-19 handgun to Eidet while the other two were in the store. Weigel agreed that he took the clip out of the gun before he showed it to Eidet. Eidet handled the gun for 2 or 3 minutes and then returned it to Weigel. Weigel testified that he then put *the magazine back in the gun* and put it in the

glove box in front of him. According to Weigel, Ancell never handled the gun at that time. Weigel then testified that the group returned to Lincoln with the radio on and everyone was in a good mood.

Weigel testified that when the group arrived in Lincoln, they decided to go to a home to steal beer out of someone's garage. They parked near the home and turned off the engine and lights. It was very dark at that location. Weigel and Ancell both left the vehicle for a few minutes. Weigel then got back into the Hummer, while Ancell stayed outside close to the passenger side door. Ancell was repeating that he wanted to go take the beer and continued joking around. Weigel testified that after he got back in the Hummer, Eidet wanted to see Weigel's Glock-19 again. Weigel removed the handgun from the glove box and handed to Eidet.

Weigel disputed Eidet's testimony. First, Weigel testified that in the dark a person in the passenger's side of the back seat of the Hummer could not see what the passenger in the front seat was doing because the seat, doorjamb, and seat belt blocked the view. Weigel stated that when Eidet returned the handgun to him, he asked Eidet if it was loaded; Eidet stated it was not loaded. Believing the handgun was unloaded, Weigel testified that he started flipping the handgun around his left hand and then switching the handgun to his right hand doing the "cowboy flip" as seen in old western movies. Weigel then placed his right hand (with the handgun) on the window ledge pointed downwards; his finger was not on the trigger. Weigel denied ever pointing the handgun directly at Ancell. Weigel and Ancell continued to disagree about stealing beer. Weigel agreed, however, that Ancell stated he would not get back in the Hummer because the handgun was pointed at him. Weigel testified that Ancell then grabbed the barrel of the handgun, pulling the handgun toward him. Weigel stated that he held the handgun tighter so it would not fall; at this point, the handgun fired. Weigel did not immediately realize that Ancell had been shot. Instead, he yelled at Eidet for telling him the gun was unloaded. But, when Weigel looked back at Ancell, he was on the ground and did not respond to

9

questions. Weigel got out of the vehicle and tried to keep pressure on Ancell's chest. Weigel denied ever pointing the gun at Ancell and intentionally pulling the trigger.

On cross-examination, Weigel admitted that he had consumed alcohol before the shooting and that his blood alcohol level 8 hours after the shooting was 0.09. Yet, he stated that his alcohol consumption did not impair his memory of that night. Weigel testified that when he put the handgun in the glove box outside the convenience store, he placed the magazine back in the gun. Also, when he passed the gun to Eidet while they were parked on School Street, the magazine was in the gun. Weigel again admitted that at one point, Ancell stated he would not get into the car with a gun pointed at him. But Weigel denied ever pointing the gun at Ancell. Weigel denied he shot Ancell, but he admitted Ancell died from a bullet from a gun Weigel was holding.

Weigel also put on the testimony of a private investigator, John Roberts, who was a former police officer and currently a handgun trainer. The private investigator testified that Weigel's vehicle was a black Hummer H3 with four doors and tinted windows, with a gray interior. The private investigator opined that a person in the back seat could not see what the person seated directly ahead of him was doing while seated in the vehicle. This was because of the center post on the exterior between the front and back seats. He presented various photographs he took from the back seat of the Hummer with someone else in the front seat. The persons in his pictures were approximately the same size as Weigel and Eidet. He also testified there was little lighting in the area and it would have been very dark. Nevertheless, he could hear the person in the front seat rack the handgun during the reenactment.

Roy Bedard also testified on behalf of the defense. He was the owner of a company that provides training to police and was a former police officer. Bedard is familiar with Glock handguns. In his training program, one of the topics was how officers could avoid the involuntary discharge of their weapons. Bedard described what was

10

called "clutch reflex." He testified that it encompasses several different types of unintended discharge situations where something happens that causes the officer with a gun to involuntarily or reflexively clutch the firearm, causing it to discharge; the effect is a neurological or physiological reaction. It can happen because of a startle reflex when an unexpected event causes a person's muscles to tense. Balance displacement also can cause muscles to tense up as you try to catch yourself when you trip over something. It also can happen through what he termed "sympathetic reaction" where a person's actions with one side of their body cause the parallel muscles on the other side of their bodies to react. Finally, Bedard stated that a more recently recognized clutch reflex situation was "grip resistance" which occurs when you are holding something and someone else grabs it, and the physical reaction tends to be to resecure your grip, causing the muscles in the hand to clutch; if your finger is on the trigger, it can cause an accidental discharge.

On cross-examination, Bedard admitted that before trial he had never been permitted to testify about the information relating to "clutch reflex." Bedard agreed that in firearms training, persons are told not to put their finger on the trigger unless you intend to shoot and not to point a gun at someone or something unless you intend to shoot. He also agreed handling a gun with your finger on the trigger while intoxicated should not be done, although he refused to classify such action as reckless.

On redirect examination, Eidet denied ever touching Weigel's handgun while they were in Lincoln, Kansas.

At the conclusion of this evidence, the court instructed the jury and the parties provided closing argument. The jury ultimately returned a verdict, finding Weigel guilty of reckless second-degree murder.

11

Before sentencing, Weigel moved for a durational departure and a motion for new trial. After hearing the arguments, reviewing letters supporting Weigel, and hearing testimony from Ancell's family, the trial court denied Weigel's motions.

The presumptive sentence for Weigel's conviction, based upon his criminal history score of I ranged from 109 to 123 months. The court also recognized that a special rule applied because the crime was committed with a firearm. The trial court denied Weigel's request for a sentence equivalent to the 5-I grid box, which would have been the case had Weigel been convicted of involuntary manslaughter. Instead, the court imposed the standard presumptive sentence of 117 months' incarceration and ordered him to serve 36 months of postrelease supervision.

*Was There Sufficient Evidence Presented at Trial to Support Weigel's Conviction for Unintentional (Reckless) Second-degree Murder?*

On appeal, Weigel first contends that there was insufficient evidence to support his conviction for reckless second-degree murder. Specifically, Weigel contends that the State failed to prove that he acted so recklessly to manifest and extreme indifference to the value of human life. In support of this claim, Weigel asserts that the jury must have totally disregarded the testimony of Eidet because it acquitted him of intentional second-degree murder. Without Eidet's testimony, Weigel argues that there was no basis for the jury to conclude that he was aware the gun was loaded. Weigel's argument is unpersuasive.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. [Citation omitted].'" *State v. Woods*, 301 Kan. 852, 874, 348 P.3d 583 (2015).

12

Reckless second-degree murder is defined as the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2015 Supp. 21-5403(a)(2) (formerly K.S.A. 21- 3402[b]). *State v. Thomas*, 302 Kan. 440, 449, 353 P.3d 1134 (2015). Formerly referred to as depraved heart murder, convictions of this crime have been upheld in a variety of circumstances. For example, in *State v. Cordray*, 277 Kan. 43, 82 P.3d 503 (2004), our Supreme Court upheld a conviction for depraved heart murder when the State established that a man had fired into darkness in the direction of a vehicle that he knew was occupied. Although the defendant maintained that his shots did not go where he intended, the court determined that this did not mitigate the extreme recklessness of his conduct. *Cordray*, 277 Kan. at 56. Our Supreme Court also upheld a conviction when a defendant was accused of blindly swinging a golf club at a person with great force. The court held that the defendant's action in swinging the golf club constituted extreme recklessness "manifesting an extreme indifference to the value of human life." *State v. Robinson*, 261 Kan. 865, 881, 934 P.2d 38 (1997). See also *State v. Deal*, 293 Kan. 872, 885-86, 269 P.3d 1282 (2012) (although defendant denied the intent to kill the victim, striking him once in the shoulder and once in the head with a metal bar was sufficient to support a finding that he acted with an extreme indifference to the value of human life); *State v. Davidson*, 267 Kan. 667, 683, 987 P.2d 335 (1999) (evidence that defendant obtained  powerful dogs known for aggressive behavior and fostered aggressive behavior by failing to properly train and socialize the dogs; the defendant also ignored information that her dogs had escaped her yard before and had displayed aggressive behavior toward neighbors which provided sufficient evidence to sustain a conviction of second-degree reckless murder when the dogs escaped and killed a child).

As noted earlier, Weigel contends that the jury must have disbelieved Eidet's testimony that Weigel deliberately chambered a bullet while handling the handgun just before he shot Ancell. Absent Eidet's testimony, Weigel maintains that the jury could have concluded only that Weigel believed either that the handgun was unloaded or that

13

no bullet had been chambered in the handgun. Thus, Weigel's premise is that his actions, even if they were reckless, did not arise to the level to manifest "extreme indifference to the value of human life." K.S.A. 2015 Supp. 21-5403(a)(2).

Weigel's argument is based upon a faulty premise. The jury was entitled to believe all or part of any witness' testimony. Our appellate courts have long recognized that even when the State's witnesses had potential credibility issues which the defendant's counsel has highlighted and addressed during cross-examination, as long as a rational jury could have believed at least some of these witnesses, a conviction will be upheld. An appellate court cannot supplant the jury's conclusions with our own credibility determinations. *State v. Logsdon*, 304 Kan. 3, 23, 371 P.3d 836 (2016).

This case involved a number of factual scenarios that, if believed by the jury, would support a conviction for second-degree reckless murder. The jury could have believed Eidet's testimony that he saw or heard Weigel chamber a bullet into the handgun before pointing the handgun in the direction of Ancell and believed Weigel was "jokingly" attempting to get Ancell to return to the vehicle. The jury could have believed Brittany that Weigel was waving the gun around and toward Ancell's body. Both Eidet and Weigel testified that Ancell had stated that he would not get back into the car with a gun pointed at him. Still, Weigel pointed what he knew or should have known to be a loaded handgun at Ancell and may have pulled the trigger without intending to kill Ancell. The jury may well have rejected Weigel's testimony that he never pointed the handgun directly at Ancell because Ancell was shot in his chest with the bullet perforating his aorta. By Weigel's own testimony he was spinning the gun around and could have unintentionally pulled the trigger and shot his friend in the center of his chest.

Similarly, the jury could have believed Weigel's testimony that he had reinserted the magazine into the handgun. As a result, Weigel acted recklessly when he neglected to remove the magazine from his handgun and to pull the slide to the rear to eject any

14

chambered bullet before waving or spinning his handgun around. The jury could have found that a 34-year-old man who was familiar with guns was acting recklessly by handling his handgun in an intoxicated condition.

Reviewing the evidence in the light most favorable to the State, a rational jury could have clearly found that Weigel's actions in the early morning hours of September 9, 2013, manifested "extreme indifference to the value of human life." K.S.A. 2015 Supp. 21-5403(a)(2). Therefore, the evidence was sufficient to support Weigel's conviction of unintentional second-degree murder.

*Did the Trial Court Commit Clear Error in Failing to Instruct the Jury on Involuntary Manslaughter as a Lesser Included Offense of Unintentional Second-Degree Murder?*

On appeal, Weigel contends that the trial court committed clear error by failing to instruct the jury on the lesser included offense of reckless involuntary manslaughter.

When a party raises issues relating to the giving or failure to give particular jury instructions, our Supreme Court has established a multi-step analysis to review such claims. Similarly, the court set forth corresponding standards of review to be applied at each of the different steps of the analysis.

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert.*

15

*denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Our first step is to consider whether there are jurisdictional or preservation issues that impact on reviewability of the instruction issue. In this case, the parties do not dispute that involuntary (reckless) manslaughter is technically a lesser included offense of second-degree (reckless) murder. See *State v. Brown*, 300 Kan. 565, 588, 331 P.3d 797 (2014) ("Reckless involuntary manslaughter differs from unintentional but reckless second-degree murder 'only in the degree of recklessness required to prove culpability.' [Citation omitted.]"). Accordingly, the trial court would have had jurisdiction to give this instruction.

Weigel, however, has failed to preserve this issue for appeal based upon the invited error doctrine. During the jury instruction conference, the parties discussed several issues. First, the defense took issue with the State's proposed separate instruction defining "intentionally" and "recklessly." The defense argued that the PIK definition of "recklessly" did not define the term to the same level of culpability as required for a conviction of second-degree reckless murder; counsel claimed the instruction lowered the State's burden of proof. The court's resolution was to ensure the elements instructions and verdict form contained the correct language regarding the level of recklessness required for second-degree murder.

Immediately after this discussion about the "recklessness" instruction, the trial court specifically stated: "And, there has been some discussion yesterday by the defense." Then the trial court asked: "Is there any request for lesser included instructions?" Defense counsel responded: "No, Your Honor. I've discussed that with my client, and we are not asking for any other lesser includeds to be given."

16

The State contends that the defendant's action in specifically requesting no other lesser included crimes instructions be given constituted invited error. The invited error doctrine applies only when the party fails to object *and* invites the error, unless the error is structural. *Logsdon*, 304 Kan. at 31. The invited error doctrine, as applied to jury instructions, requires more than a party failing to object to a jury instruction; instead, the party must take some affirmative action to prevent or dissuade the court from giving the instruction. See *State v. Angelo*, 287 Kan. 262, 280, 197 P.3d 337 (2008) (invited error when trial court acceded to the defendant's two requests that a legally appropriate lesser included instruction not be given).

Weigel relies on *State v. Soto*, 301 Kan. 969, 349 P.3d 1256 (2015), to support his contention that he did not invite error in this case. In *Soto*, the defendant was charged with aiding and abetting first-degree murder. The State proposed jury instructions for first-degree murder, second-degree intentional murder, and voluntary manslaughter. During the instruction conference, the court stated there was no evidence to support the lesser included instructions. Both the defense counsel and the prosecutor agreed, and no lesser included instructions were given. Nevertheless, Soto argued on appeal that the failure to give the lesser instruction was clear error. The key in *Soto*, however, was that his counsel "made no affirmative request to omit" the lesser instruction nor "did defense counsel decline an offer by the court to give the instruction." 301 Kan. at 984.

In this case, the parties were clearly focused on the level of recklessness required by the crimes charged before addressing the question of lesser included instructions. Defense counsel specifically requested no lesser included instructions be given, stating that she had conferred with her client about the matter. Thus, defense counsel made an "affirmative request to omit" the other instructions and affirmatively declined the court's invitation for other instructions. It seems clear based upon Weigel's strong opposition to the motion to amend the complaint and his rejection of other lesser crime instructions that the defense was focusing on an "all or nothing" strategy. Under these circumstances, we

17

conclude that the defendant actively contributed to what he now claims was trial court error and is precluded from raising the lesser included instruction issue on appeal.

*Did the Trial Court Commit Reversible Error When It Determined Sufficient Evidence at the Preliminary Hearing on the Original Charge of Intentional Second-degree Murder?*

Weigel also contends that based upon the evidence presented at the preliminary hearing, he should never have been bound over for trial on the original charge of intentional second-degree murder. Weigel preserved this issue for purposes of appeal by filing a timely motion to dismiss after the preliminary hearing and the arraignment. See K.S.A. 2015 Supp. 22-3208(4); *State v. Brown*, 299 Kan. 1021, Syl. ¶ 5, 327 P.3d 1002 (2014) (failure to file a timely motion to dismiss before conviction waives any claim that the evidence at the preliminary hearing was insufficient to bind the defendant over for trial).

To bind a defendant over for trial, the State must present evidence at a preliminary hearing sufficient to show that it appears a felony was committed and that *probable cause* exists to believe that the defendant committed the crime. *State v. Palmer*, 248 Kan. 681, 688, 810 P.2d 734 (1991). Probable cause at a preliminary hearing signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain reasonable belief of the accused's guilt. *State v. Butler*, 257 Kan. 1043, 1059, 897 P.2d 1007 (1995).

On appeal from the granting or denial of a motion to dismiss filed after the preliminary hearing, an appellate court reviews the trial court's finding of probable cause under a de novo standard. *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012). When an appellate court reviews the evidence, all inferences are drawn in favor of the State because the evidence need only show probable cause rather than guilt beyond a reasonable doubt. Consequently, weak evidence can be sufficient to bind a defendant

over for trial as long it is sufficient to establish that the crime was committed and that defendant committed that crime. *Washington*, 293 Kan. at 734.

The State's only witness at the preliminary hearing was Brittany Strathman. Brittany described the late night events of September 8, 2013, and the early morning hours of September 9, 2013, while she was with Weigel, Ancell, and Eidet. Brittany described the men's alcohol consumption and their trip to a convenience store to buy soda. She testified that when she returned to the Hummer, Weigel took a semiautomatic handgun out of the glove box and after removing the clip, passed the handgun among the other men. When Brittany complained about the handling of the handgun, Weigel seemed irritated by Brittany's reaction to the gun. But she did testify that Weigel placed the handgun and ammunition clip, which was no longer in the handgun, in the vehicle's glove box.

Brittany also testified about their drive to Lincoln, Kansas, and Weigel's suggestion about stealing beer from another person's garage. She testified that Weigel and Ancell got out of the Hummer. They discussed the idea of stealing the beer on the passenger side of the vehicle. Weigel then reentered the car with Ancell leaning on the passenger side within a couple feet of Weigel. Weigel insisted that Ancell get back into the vehicle. Brittany looked away; however, when she looked back, Weigel had pulled the handgun out of the glove box. Weigel was waving the handgun around toward Ancell, telling Ancell to get back in the car. Weigel seemed to be acting irritated, weird, and "sketchy." Brittany then heard a shot and saw Ancell fall. After about 30 seconds, Weigel got out of the Hummer and told her to call 911. After police arrived, Weigel's father, who was also the sheriff, arrived. Brittany heard Weigel's father ask Weigel if the handgun was his and if he had shot Ancell. Weigel admitted that the handgun was his and that he had shot Ancell.

In a later motion to dismiss, Weigel argued that Brittany's testimony was insufficient to establish probable cause that he committed intentional second-degree murder because the evidence failed to establish that he intended to shoot Ancell. The trial court concluded that Brittany's testimony that Weigel had the gun in his hand and was pointing and waving it in Ancell's direction, coupled with the statements that Weigel made to his father after the shooting, was sufficient evidence to bind Weigel over on the charges of intentional second-degree murder.

On appeal, Weigel argues that the evidence from the preliminary hearing, at best, established that Weigel believed the gun was unloaded and that it was an accidental shooting. Thus, Weigel contends that the trial court should have dismissed the complaint. Weigel relies solely on *State v. Horton*, 283 Kan. 44, 56-60, 151 P.3d 9 (2007), to support his arguments. Weigel's reliance on *Horton* is misplaced.

Indeed, our Supreme Court, following the lead of the United States Supreme Court, has held that when an error occurs in the preliminary hearing (or grand jury proceeding in federal court), automatic reversal is not required where the defendant had been tried and found guilty beyond a reasonable doubt. *Butler*, 257 Kan. at 1061 (quoting *United States v. Mechanik*, 475 U.S. 66, 70, 106 S. Ct. 938, 89 L. Ed. 2d 50 [1986]); see *State v. Jones*, 290 Kan. 373, 381, 228 P.3d 394 (2010). Accordingly, "'after an accused has gone to trial and has been found guilty beyond a reasonable doubt, any error at the preliminary hearing stage is considered harmless unless it seems that the error caused prejudice at trial.' [Citation omitted.] *State v. Brown*, 299 Kan. 1021, 1030, 327 P.3d 1002 (2014).

In this case, Weigel argues that the denial of the motion to dismiss was prejudicial because he was acquitted of intentional second-degree murder at trial. Nevertheless, the amended complaint charged Weigel with both intentional second-degree murder and, alternatively, with reckless second-degree murder. The fact that Weigel was convicted of

20

the alternative charge fails to establish prejudice. At the preliminary hearing stage, as in any other criminal proceeding, intent is rarely established by direct evidence. *State v. Griffin*, 279 Kan. 634, 638, 112 P.3d 862 (2005). Instead, it may be shown by acts, circumstances, and inferences reasonably deducible from the evidence. 279 Kan. at 638.

In this case, Brittany clearly remembered Weigel removing the magazine from the gun as it was being handed around outside the convenience store. She also clearly remembered Weigel returned the clip and gun to the glove box *separately*. Thus, when she saw Weigel waving the gun around while on School Street, Weigel must have intentionally, at some point after leaving the convenience store, reinserted the magazine into the handgun before waving it around with it pointed towards Ancell's chest. The combination of Weigel's irritation and "sketchy" attitude when Ancell refused to reenter the car, together with the fact that Weigel must have reinserted the magazine into the handgun and chambered a round into the handgun was sufficient to support a probable cause finding that Weigel, drunk and angry, intended to kill Ancell.

*Did the Trial Court Commit Reversible Error When It Permitted the State to Amend the Complaint During the Trial to Add an Alternative Charge of Unintentional (Reckless) Second-degree Murder During the Trial?*

On the morning of the second day of trial, the State requested leave to amend the complaint to charge an alternative charge of unintentional reckless second-degree murder. Weigel strenuously objected to the requested amendment, noting that the amended complaint charged a different crime with different elements. Defense counsel noted that the State had 14 months to decide what level of charges to litigate and that Weigel had not had a preliminary hearing for the new charge.

In response, the State argued that it had filed its instructions before trial and included instructions for both intentional and reckless second-degree murder. It asserted

21

that it had the right to amend the complaint up until the time the case was given to the jury and that the alternative charges involved no new or different evidence. Agreeing with the State, the trial court granted the motion to amend the complaint.

Under K.S.A. 22-3201(e), the trial court "may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." When addressing such an amendment an appellate court must apply a two-part analysis. First, the court must determine if the amendment charges an additional or different crime. Second, the court must determine whether the substantial rights of the defendant were prejudiced by the amendment. *State v. Matson*, 260 Kan. 366, 370, 921 P.2d 790 (1996). Prejudice is the determining factor. We review the determination on the prejudice prong for abuse of discretion. *State v. Spangler*, 38 Kan. App. 2d 817, 823-24, 173 P.3d 656 (2007).

Our Supreme Court has held that, before trial, the State has wide discretion to amend a complaint both as to form and as to substance. *State v. Woods*, 250 Kan. 109, 111-12, 825 P.2d 514 (citing *State v. Niblock*, 230 Kan. 156, 163, 631 P.2d 661 [1981]), *cert. denied* 506 U.S. 850 (1992); see *State v. Chavez-Aguilar*, No. 103,878, 2011 WL 6382742, at *3 (Kan. App. 2011) (unpublished opinion).

This case is similar to *State v. Donaldson*, 279 Kan. 694, 711-12, 112 P.3d 99 (2005). In *Donaldson*, the defendant was charged with first-degree felony murder based on an underlying crime of felony theft. Just before trial, the State moved to amend the information to include an alternative count of felony murder based upon aggravated robbery. Our Supreme Court found that the amended information did not prejudice the defendant where his defense of denial applied to both the original and amended alternatives charges and that the evidence at the preliminary hearing established evidence supporting both alternatives. 279 Kan. at 712.

22

On appeal, Weigel acknowledged that reckless second-degree murder is not a "new or different crime" from intentional second-degree murder. Instead, Weigel contends that he was prejudiced by the late amendment especially because the State knew since the preliminary hearing that the evidence of intentional second-degree murder was weak, especially after the defense moved to dismiss the charges.

The defense claimed that based upon the State's persistent allegations of intentional second-degree murder, it prepared its opening statements and cross-examined the State's witnesses the first day of trial understanding that the defense needed only to disprove an intentional killing. Weigel maintains that he was entitled to believe that this was an "all or nothing" prosecution. Despite earlier conceding that the State's amendment did not charge a new or different crime, Weigel argues surprise because it is less than clear that reckless second-degree murder is a lesser included offense of intentional second-degree murder. Weigel relies on *State v. Monreal*, No. 89,304, 2003 WL 23018231 (Kan. App. 2003) (unpublished opinion), *rev. denied* 277 Kan. 926 (2004).

*Monreal* provides little support for Weigel's contention. In *Monreal*, the defendant was charged with second-degree murder. On appeal, she argued that the trial court erred in failing to instruct the jury on the lesser included offense of reckless second-degree murder. The *Monreal* court questioned whether reckless second-degree murder was an included crime because of the differences between intentional conduct and reckless conduct. Ultimately, however, the court determined that the facts presented at trial, taken in the light most favorable to the defendant, did not support a reckless instruction; rather the evidence established that defendant's actions were clearly intentional. Accordingly, the court determined that the refusal to give the instruction was not error. 2003 WL 23018231, at *2.

Moreover, a number of cases have determined that the reckless version of a crime is a lesser included offense of the intentional version of the same crime. For example, in

23

*State v. Killings*, 301 Kan. 214, 225, 340 P.3d 1186 (2015), our Supreme Court recently held that reckless second-degree murder is a lesser included offense of intentional second-degree murder. Likewise, in *State v. Gatlin*, 292 Kan. 372, 253 P.3d 357 (2011), our Supreme Court held that the facts presented at a trial on charges of intentional aggravated battery warranted jury instruction on the lesser included crimes of reckless aggravated battery. 292 Kan. at 377. In *State v. Tahah*, 293 Kan. 267, 262 P.3d 1045 (2011), the Supreme Court held that based on the facts of a felony-murder case, the trial court erred in failing to give lesser included offense instructions for reckless second-degree murder and reckless involuntary manslaughter. 293 Kan. at 273. See also *State v. Jones*, 27 Kan. App. 2d 910, 914, 8 P.3d 1282 (2000) (finding that unintentional second-degree murder is a lesser included offense of first-degree murder).

Although Weigel contends that he was ambushed at trial, the State provided notice before trial by the instructions it filed 10 days before trial; those proposed instructions included the alternative charge of unintentional (reckless) second-degree murder.

Moreover, as we explained earlier, unintentional (reckless) second-degree murder is a lesser included offense of intentional second-degree murder. Thus, Weigel's counsel knew or should have known that the trial court would have been required to give any legally and factually appropriate lesser included instruction in this case. See *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014) (The trial court shall instruct the jury on lesser included offenses where there is some evidence that would reasonably justify a conviction of the lesser included offense. K.S.A. 22-3414[3]). Moreover, the "evidence need not be strong or conclusive to warrant the instruction." *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014).

Obviously, based on the evidence presented at trial, the trial court was required to give a lesser included instruction of unintentional second-degree murder. Considering the facts presented at trial, we point out that two eyewitnesses established that Weigel,

24

regardless of his intent, pointed a loaded handgun at Ancell. This was certainly a reckless act, made more so by the fact that Weigel was intoxicated. When one further considers that the evidence showed that Weigel not only pointed the handgun at Ancell but also chambered a bullet into his handgun, that Ancell told Weigel not to point the handgun at him, and that Weigel failed to keep his handgun pointed in a safe direction, we conclude that Weigel was not prejudiced by the trial court granting the amended complaint.

*Did the Trial Court Abuse Its Discretion in Admitting Gruesome Photographs During the Trial?*

Finally, Weigel contends that the trial court committed reversible error by permitting the State, over his objection, to present several color photographs to the jury depicting portions of the autopsy. Weigel argues that the photographs were unduly gruesome and that their relevance was outweighed by their prejudicial nature.

On the morning of the second day of trial, outside the presence of the jury, the State presented the court with various photographs taken by a witness scheduled to testify that day. The photographs were taken during the autopsy of Ancell's body and were numbered exhibits 30 through 43.

Defense counsel objected. She noted that the State presented nearly 20 photographs, mostly black and white, of the crime scene the day before, some of which were rather gruesome in nature. She argued that the photographs were not necessary to assist the jury because the defendant did not dispute that Ancell was shot and that he died as a result of his wound. Counsel objected because the photographs were graphic, that Ancell was known in the community, and that the photos would only serve to inflame the jury. Weigel specifically objected to Exhibits 34-35 and 37-40. The State agreed to withdraw exhibits 34 and 35, but wished to present Exhibits 37-40 because they showed the path of and damage caused by the bullet. Later, the State agreed to withdraw Exhibit

38. The trial court held the State could admit Exhibits 37, 39, and 40, and the court advised counsel to renew her objections. The parties agreed, however, that while one witness would lay the foundation for the photos, they would only be published to the jury during the testimony of the coroner.

The standard of review for the admission of photographic evidence involves several steps. First, an appellate court must determine whether the photos are relevant. If the photos are relevant, the court must determine whether the photographs are prejudicial, that is, overly repetitive, gruesome, or inflammatory. The standard of review is abuse of discretion. *State v. Tague*, 296 Kan. 993, 1002, 298 P.3d 273 (2013). The burden of proving the trial court abused its discretion is on the party asserting the error. 296 Kan. at 1002. Our Supreme Court noted in *Tague*:

> "'Photographic evidence, like other evidence offered at trial, is relevant and generally admissible if the photographs have a reasonable tendency to prove a material fact in the case. [Citation omitted.] Although they may sometimes be gruesome, autopsy photographs that assist a pathologist in explaining the cause of death are relevant and admissible. [Citations omitted.] However, admitting gruesome photographs simply to '"inflame the minds of the members of the jury"' is error. [Citation omitted.] We have also often said that admission of unduly repetitious photographs can constitute an abuse of discretion. [Citation omitted.] The key, as with prejudice, is the word unduly. [Citation omitted.] The admission of photographs in a murder case has rarely been held to be an abuse of discretion. [Citation omitted.]' *State v. Rodriguez*, 295 Kan. 1146, 1156-57, 289 P.3d 85 (2012)." *Tague*, 296 Kan. at 1002.

Weigel objected to the photographs during a pretrial conference on the morning of the second day of trial; however, the judge overruled the objections after seeing the key photographs and advised defense counsel she could renew her objections when presented. When the KBI agent who took the photographs laid the foundation for those exhibits, Weigel did not object. Nevertheless, when the photographs were shown to the jury

26

through a projector during the testimony of Dr. Hossain, the deputy coroner, the defense renewed its objections to the photographs.

The coroner used the photographs to show the entrance wound on Ancell's bare chest. Exhibits, 37, 39 and 40 showed, respectively, the wound in the underlying chest muscles in relation to the ribs, the heart (after the sternum and rib cage were removed), and blood in the chest cavity. Finally, the photograph showed the damage that the bullet caused to the aorta. Dr. Hossain's testimony regarding those particular exhibits took approximately 4 minutes according to the transcript. Dr. Hossain testified that there was no evidence of a contact wound—that is, that the gun was pressed against Ancell's body when the shot was fired.

In this case, the exhibits, although gory, were relevant to show the trajectory of the bullet through Ancell's body. Because Weigel maintained that the shooting was accidental, the fact that Ancell was struck dead-center in his chest with a slight right to left and downward trajectory was highly relevant. The exhibits were also relevant to Weigel's defense: that Ancell grabbed the gun, causing it to fire. It was up to the jury to determine whether Weigel intentionally aimed his handgun at Ancell and pulled the trigger, whether Weigel could have recklessly discharged his weapon in a manner to cause such injuries, or whether the injury was consistent with Weigel's defense theory of an accidental shooting.

In light of the limited number of photos, the brevity of the discussion and display of the photos, and their obvious relevance to the issues in the case, the trial court did not abuse its discretion in allowing the admission of the three photographs.

Affirmed.

27